Abraham S. KRAMER, Plaintiff,

v.

MARINE MIDLAND BANK and Toyota of Rockland, Inc., Defendants.

No. 80 Civ. 4431 (WK).

United States District Court, S.D. New York.

Feb. 24, 1983.

As Corrected March 1, 1983.

Daniel L. Kurz, Monsey, N.Y., for plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for defendants.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

### BACKGROUND

The case is before us on cross-motions for summary judgment. On August 3, 1979 plaintiff bought an automobile from Toyota of Rockland, Inc. (the dealer). The transac-

tion contemplated a partial down-payment of about $2,100, the balance of the price—about $2,800—to be financed by Marine Midland Bank (the bank) in 48 equal monthly instalments. It is undisputed that the bank maintained a business relationship with the dealer. Pursuant to this relationship the bank regularly financed the dealer's sales, provided the dealer with forms, approved the creditworthiness of each borrower, and was immediately assigned the sales contract entered into between the customer and the dealer. The Retail Instalment Contract form supplied by the bank [1] contains an indication—evidenced by plaintiff's additional signature in the appropriate box—that plaintiff purchased credit life insurance, the premiums on which insurance were advanced by the bank and included in the total amount financed. Plaintiff contends, however, that such insurance was foisted upon him by the prevarication of the dealer who is alleged to have given a "vague answer to the effect that that was the way the [bank's] form was set up" in response to plaintiff's question why two separate signatures were required.

On October 22, 1979—after the instalments of September 3 and October 3 had been paid [2]—plaintiff was ready to pay off the balance due on the loan. He inquired from the bank what was the outstanding balance and then paid the amount he was told to be due. A few weeks later, however, he received in the mail a $30.22 refund because—so the bank advised him—the amount due at the time of prepayment had been overstated.

This small refund piqued plaintiff's curiosity as to precisely how the correct amount due had been calculated. He was advised at the bank to write for information, but plaintiff elected initially to pursue his inquiries by telephone. Such efforts, however, proved unsuccessful. In December of 1979 he finally made a written request for information.

In response, the bank confirmed that the loan had been fully paid off, advised him that a refund on unearned credit life insurance might be due, but failed otherwise to respond as completely as plaintiff wished. Plaintiff appears to have been particularly irked by the bank's perceived parsimoniousness in providing the desired information combined with its suggestion that he apply to the dealer for a refund on unearned credit life insurance premiums. Later inquiries by an attorney also failed to produce a response which measured up to plaintiff's expectations. Finally, plaintiff brought this action charging the bank [3] with at least ten different violations of the Truth-in-Lending Act [TILA], 15 U.S.C. § 1601 *et seq.*, and the regulations promulgated thereunder, Regulation Z [Reg. Z], 12 C.F.R. 226.1 (1982) *et seq., reprinted in* 15 U.S.C.A. fol. § 1700, and with several violations of various New York consumer protection laws.[4]

## THE TRUTH–IN–LENDING CLAIMS

### I

The instalment contract includes the following clause on its front page:

1. As an exhibit to this opinion we have included a copy of the form involved in this transaction. No further specific reference will be made to this exhibit and we will dispense with descriptions of specific features on the assumption that the reader will liberally consult the exhibit whenever necessary. [Original size 16 × 8½ inches, printed on both sides.]

2. There is some question whether the first of the two instalments was paid on time. Plaintiff's long factual submission on this score is, however, immaterial to the issues before us.

3. Although both the bank and the dealer are named defendants, there is no indication in the court records that process was ever served on the dealer.

4. After the events which gave rise to this litigation, TILA and its regulations were extensively revised. *See* TILA Simplification and Reform Act of 1980, Pub.L. No. 96–221, 94 Stat. 168 (1980); Revised Regulation Z 46 Fed.Reg. 20892 (April 7, 1981), *reprinted in* 12 C.F.R. at 829–993 (1982). The new statutory provisions became effective on October 1, 1982. The revised regulations were effective April 1, 1981 but compliance was optional until October 1, 1982. *See* Pub.L. No. 96–221 § 625, as amended; 47 Fed.Reg. 756, January 7, 1982. All references hereafter—unless specifically noted—are to the statute and Regulation Z as they stood before the revisions.

4. PREPAYMENT OF CONTRACT. If I pay this contract in full before the final due date, *what I owe you will be reduced by the amounts of* the Finance Charge and *insurance charge* which have not yet been earned, figured by the RULE OF 78'S. (That is a method authorized by law for figuring earned charges and refunds.) You may deduct a fee of $15 from the Finance Charge before figuring the unearned portion. You don't need to give me any Finance Charge credit or insurance charge credit which amounts to less than $1. (Emphasis added).

Plaintiff argues that this statement is in violation of TILA because "the payoff balance [was] *not* reduced by the amount of unearned [insurance] charges, but in fact Marine Midland relegated the consumer to his own devices to seek out and attempt to obtain the insurance rebate from other sources." Plaintiff's Supplemental Brief at 16a–17 (emphasis in original). *See also* Plaintiff's Supplemental Memorandum at 30. This factual contention is undisputed. *See* Affidavit of F.G. Cologgi ¶ 6. The bank responds on two fronts. First, it claims that the quoted paragraph complies with Reg. Z 226.8(b)(7) which only requires "[i]dentification of the method of computing any unearned portion of the finance charge in the event of prepayment..."[5] Second it claims that it has no obligation—under federal or state law—to rebate any portion of the unearned insurance charges. *See* Defendant's Memorandum at 13; Defendant's Reply Memorandum at 10.

We hold that a violation of Reg. Z 226.6(a)[6] and Reg. Z 226.6(c)[7] has been established. The quoted paragraph cannot fairly be understood in any other way but to state that the buyer is not required—in the event he were to prepay his debt—to pay *the bank* an amount which includes the unearned insurance charges. As, in fact, the bank's practice is not to credit unearned insurance charges, the quoted paragraph can hardly be said to constitute a "clear" disclosure under Reg. Z 226.6(a), or one that is not "misleading" or "confusing" under 226.6(c). *Cf. Wright v. Tower Loan of Mississippi, Inc.* (5th Cir.1982) 679 F.2d 436, 444 (statement that borrower subject to non-existent charges held to be misleading; burden on creditor to prove that additional information is not misleading); *Smith v. Chapman* (5th Cir.1980) 614 F.2d 968, 977 (statement that a sum includes a particular item when it is not so included held to be misleading); *Weaver v. General Finance Corp.* (5th Cir.1976) 528 F.2d 589, 590 (statement that premiums for voluntary insurance would be "deducted" from the amount financed, when, in fact, they were part of the total amount borrowed, held to be misleading).

The bank's arguments entirely miss the mark. It is altogether irrelevant whether the quoted paragraph complies with another provision of Reg. Z or whether the bank is or is not under an obligation to rebate or credit unearned life insurance premiums.[8] On the assumption that the

---

5. Reg. Z 226.8(b)(7) provides, in relevant part, for the identification of:

[T]he method of computing any unearned portion of the finance charge in the event of prepayment in full of an obligation which includes precomputed finance charges... If the credit contract does not provide for any rebate of unearned finance charges upon prepayment in full, this fact shall be disclosed. * * *

6. Reg. Z 226.6(a) states in relevant part:

*Disclosures; general rule.* The disclosures required to be given by this part shall be made clearly, conspicuously, in meaningful sequence...

    *   *   *   *   *   *

7. Reg. Z 226.6(c) states in relevant part:

*Additional information.* At the creditor's... option, additional information or explanations may be supplied with any disclosure required by this part, but none shall be stated, utilized, or placed so as to mislead or confuse the customer... or contradict, obscure, or detract attention from the information required by this part to be disclosed.

8. Defendant appears also to make two additional arguments. First, that, since "the insurance premium at issue was not part of the finance charge, the rebate of that charge is not addressed by Regulation Z § 226.8(b)(7)." Second, that this "claim relates to the *manner* in which the rebate is made rather than to the *method* by which it is computed." Defendant's Reply Memorandum at 9–10 (emphasis in origi-

bank is under no such obligation, a TILA violation nonetheless stems from the bank's misleading suggestion that it would so credit the buyer's account upon prepayment. We do not hold that the bank must rebate or credit unearned premiums, but only that it may not claim that it will do so when that is not, in fact, its practice.

■ We are mindful, of course, that TILA should not be used as an "instrument of harassment and oppression of the lending industry." *Bates v. Provident Consumer Discount Co.* (E.D.Pa.1979) 493 F.Supp. 605, 607 (*quoting Sharp v. Ford Motor Credit Co.* (S.D.Ill.1978) 452 F.Supp. 465, 468) *aff'd* (3d Cir.1980) 631 F.2d 725. We are not concerned, however, with a violation of one of TILA's many minute technical requirements, with which—except in truly *de minimus* cases—strict compliance is demanded. *Reneau v. Mossy Motors* (5th Cir.1980) 622 F.2d 192, 195 (citing cases). We are concerned here with a determination whether a particular disclosure is clear or confusing. In that exercise we must be guided by what is probable and reasonable, *Williams v. Western Pacific Financial Corp.* (5th Cir. 1981) 643 F.2d 331, 339, and—more generally—by TILA's purpose to promote the informed use of credit, *Anderson Bros. Ford v. Valencia* (1981) 452 U.S. 205, 219–20, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 and to deter lenders from making misleading disclosures. *Williams v. Public Finance Corp.* (5th Cir. 1979) 598 F.2d 349, 355. Plaintiff's submissions, *see, e.g.*, Plaintiff's Supplemental Brief at 4 n. 2, suggest that he was driven to sue primarily by his chagrin for being treated in what he perceived to be a cavalier fashion in connection with the rebates of unearned credit life insurance, rather than by an ambition to seek redress for the many alleged technical violations with which he charges the defendant. To the extent that plaintiff's perception of having been treated unfairly was caused by the above quoted

paragraph, we cannot but agree with him that it would most reasonably be understood as promising him a reduction in his indebtedness which the bank was not prepared to vouchsafe. Particularly in light of the mandate that we interpret TILA liberally, *James v. Ford Motor Credit Co.* (10th Cir.1980) 638 F.2d 147, 149, in the consumer's favor, *Davis v. Werne* (5th Cir.1982) 673 F.2d 866, 869 (citing cases), we are compelled to find that the quoted paragraph is unclear and misleading and, therefore, violates the strictures of TILA.[9]

## II

■ In connection with the above-quoted paragraph, plaintiff also charges the bank with a TILA violation because of its practice to compute prepayment rebates "by a method which, while based upon the Rule of 78's tables, deviated from their prescribed manner of application in a way which penalized the consumer and benefited Marine Midland." Plaintiff's Supplemental Brief at 16a. *See also* Plaintiff's Memorandum at 30–31; Complaint ¶ 12(d).

The Rule of 78's—also known as the sum-of-digits method—is a procedure to compute rebates due on unearned charges when a loan is paid off before maturity. *See, e.g.*, J.G. Donaldson, *Retail Instalment Sales Legislation,* 19 Rocky Mountain L.Rev. 135, 152 (1947); Comment, *Consumer Protection: Truth-in-Lending Disclosure of the Rule of 78's,* 59 Iowa L.Rev. 164 (1973); Comment, *Rule of 78's and the Required Disclosures Under Regulation Z,* 23 Kan.L.Rev. 709 (1975). Suppose that a loan is to be repaid in monthly instalments. Under the Rule, each month of the loan's term is assigned a number (digit), which—for the first month—is equal to the total number of months (payment periods) over which the loan is to be repaid. Each successive month is assigned a number one less than the previous month. Accordingly, the number

---

nal). Although the latter is surely a clever turn of phrase, both formulations amount to no more than a restatement of the argument that the quoted paragraph complies with Reg. Z 226.8(b)(7).

9. We need not, of course, find that plaintiff was actually deceived by a misleading disclosure in order to fix liability under TILA. *Charles v. Krauss Co.* (5th Cir.1978) 572 F.2d 544, 546 (citing cases).

assigned to the last month is always 1. For a twelve month loan, the sum of the digits is 78 (12 + 11 + 10 ... + 1 = 78). The sum of the digits varies, of course, with the number of agreed upon instalments: for a 3-instalment loan, for instance, the sum is 6, for a 6-instalment loan it is 21, and for a 24-instalment loan it is 300. *See Bone v. Hibernia Bank* (9th Cir.1974) 493 F.2d 135, 136–37 (citing sources). The proportion of prepaid charges to be rebated is a ratio (percentage factor), the denominator of which is the loan's sum of digits and the numerator of which is a sum—smaller than the denominator—which excludes the digits assigned to the months during which the loan had remained outstanding.[10] This claim turns on a dispute as to precisely how many months should have been excluded from the computation of the numerator.[11]

Plaintiff argues that on October 22—when the loan was prepaid—it *had been* outstanding for only two *complete* months, and consequently, that only the digits of the first two months should have been excluded from the computation of the numerator. This yields a rebate ratio of 91.92 percent of prepaid charges, rather than the 88.01 per-cent used by the bank.[12] Plaintiff's meth-od—he claims—is the only correct way to apply the Rule of 78's. A different compu-tation is a "bank-favoring misuse of the Rule of 78's", Plaintiff's Memorandum at 31, and thus a violation of TILA. In re-sponse, the bank states that it is licit to use a "version" of the Rule of 78's method which excludes from the calculation of the numerator of the rebate ratio all the months during which the loan was out-standing, *including* the one that has not fully run at the time of prepayment. *See* Affidavit of F.G. Cologgi ¶¶ 3–5. As the loan was prepaid on October 22, the bank's method calls for the exclusion (from the sum of digits in the numerator of the re-bate ratio) of *three* instalments—the two which plaintiff concedes *plus* the third in-stalment that would have been due Novem-ber 3. This, of course, yields a rebate ratio of 88.01 percent of prepaid charges, and consequently, a rebate approximately $31 smaller than had the method advocated by plaintiff been used.[13]

The germane facts are not in dispute.[14] We note, at the outset, that the legal ques-tion before us is not whether—under feder-

---

**10.** This method of calculating refunds acquired its name because many installment contracts in the early 1900s were for 12 months and the sum of digits for a 12-installment loan is 78. It was a widely used algorithm because it is much less laborious than the actuarial method but yields—at least for contracts with few instal-ments—results that are close to the actuarial method's, although they are always less favor-able to the borrower. Recently, however, the Rule of 78's has been questioned because, with computers and sophisticated desk calculators in common use, computational simplicity is no longer a solid argument to perpetuate a proce-dure of calculating rebates which—compared to the actuarial method—yields increasingly less favorable results to the borrower the long-er the contract maturity and the earlier the prepayment. *See* E. Altman, *Financial Hand-book* 9–20, 9–21 (5th ed. 1981).

**11.** This is the logical implication of the parties' contentions, although—with the exception of the conclusion that a particular percentage is the "correct" result—neither side presents its argument in explicitly numerical terms.

**12.** The numerical detail is as follows. The sum-of-digits for a 48-installment loan is 1176 (48 + 47 + 46 + ... + 3 + 2 + 1 = 1176).

Thus, the denominator of the rebate ratio is 1176. Plaintiff contends that the correct way to calculate the numerator of this ratio is to exclude *only the two full instalments* during which the loan had been outstanding on Octo-ber 22. Accordingly, the numerator of the re-bate ratio is 1081 (46 + 45 + 44 + ... + 3 + 2 + 1 = 1081). The rebate ratio, therefore, is 1081/1176 = 91.92 percent.

**13.** The detail is as follows. Again, the sum-of-digits for the entire loan is 1176. The denomi-nator, as in the plaintiff's calculations, is 1176. The numerator, however, is 1035, rather than 1081 (45 + 44 + 43 + ... + 3 + 2 + 1 = 1035). Hence, the rebate ratio—as the bank calculates it—is 1035/1176 = 88.01 percent. The difference in the two ratios is 3.91 percent. Accordingly, the use of the bank's ratio results in a rebate that is, in this case, $31.47 smaller than had the plaintiff's ratio been used (*i.e.,* $804.92 × 3.91 percent = $31.47).

**14.** There is immaterial argument as to how and when certain refund errors were corrected, but there is no dispute that the bank used—and intended to use—a rebate ratio of 88.01 per-cent. Affidavit of F.G. Cologgi ¶¶ 4–5.

al law—the bank is entitled to calculate the rebate with the method it used. In fact, TILA contemplates the possibility that a creditor will rebate *no* unearned charges upon prepayment. *See* Reg. Z 226.8(b)(7).[15] TILA "does not require the lender to use any particular method of computing unearned finance charges; rather, the statute is aimed solely at assuring that the method ultimately used by the lender is disclosed to the consumer." *Gantt v. Commonwealth Loan Co.* (8th Cir.1978) 573 F.2d 520, 526. The issue is whether, having chosen this particular method of calculating unearned charges, the bank was entitled under TILA to refer to it as the "Rule of 78's."

The parties' meagre efforts notwithstanding[16], we are not entirely without guidance on this matter. The Fifth Circuit recently rejected precisely the claim before us. *Gallois v. Commercial Securities Co.* (5th Cir.1981) 661 F.2d 901, 904. The Court noted that the problem arises from there being "no single 'Rule of 78'." *Id.* n. 3. However, it pointed out that the drafts of another "one month after" provision—the method of computation in the Uniform Consumer Credit Code (UCCC), *see* UCCC (1968 act) § 2.210(3), 7 U.L.A. 326 (1978)[17]—had been referred to by the Federal Reserve

Board as "present[ing] the 'Rule of 78's'." F.R.B. Official Staff Interpretation No. FC–0044, 41 Fed.Reg. 9385, February 4, 1977, *reprinted in* 12 C.F.R. at 719–20 (1982). Furthermore, in later versions of the UCCC its drafters specifically referred to a method that is consistent with the bank's approach as "permit[ting] ... the 'Rule of 78 method' of calculating the unearned portion of the finance charge..." UCCC (1974 Act) § 2.510 comment 5, 7 U.L.A. 693 (1978)[18]

The foregoing demonstrates that methods which, as to timing, are consistent with the bank's approach, have been termed a "Rule of 78's" at least by one Court of Appeals, by the drafters of the UCCC, and by the Federal Reserve Board. Accordingly, we join the *Gallois* court in holding that what it called the "one month after" method, *Gallois, supra,* 661 F.2d at 904 n. 3, can properly be referred to as a "Rule of 78's."

There being, of course, no dispute that reference to a "Rule of 78's" is sufficient to satisfy the identification requirements imposed by Reg. Z 226.8(b)(7), *see Gallois, supra,* 661 F.2d at 904; *Gantt v. Commonwealth Loan Co., supra,* 573 F.2d at 525–26 (citing cases); Reg. Z 228.818(c), we con-

**15.** The last sentence of Reg. Z 226.8(b)(7) states that:

> If the credit contract does *not* provide for *any* rebate of unearned finance charges upon prepayment in full, this fact shall be disclosed. (Emphasis added.)

**16.** Plaintiff's only "argument" is a naked reference to the instructions for use printed on an unidentified table of pre-calculated rebate ratios, which instructions—it is argued—support his position. Defendant merely states, without elaboration, that certain provisions of New York law are a "definition of the Rule of 78's."

**17.** The relevant portion of UCCC § 2.210 reads, in part, as follows:

> § 2.210 [Rebate Upon Prepayment]
> \* \* \* \* \* \*
> (3) ... [T]he unearned portion of the credit service charge is a fraction of the credit service charge of which the numerator is the sum of the periodic balances scheduled to *follow the computational period in which prepayment occurs,*... (Emphasis added.)
> \* \* \* \* \* \*

We note—as did the *Gallois* court in connection with the relevant Louisiana statute—that

this provision of the UCCC is, so far as the crucial issue of timing is concerned, substantially similar to New York's PPL § 305(1), the provision which, plaintiff states, "defines" the Rule of 78's in New York. *See* note 63, below. Even if the above-quoted language were not to dispel the ambiguity as to its application, the examples which follow its official comment leave no doubt that the rebate method described is consistent, as to timing, with the defendant's position. *See e.g.,* UCCC (1968) Act § 2.210 comment 1, example 3, 7 U.L.A. 329–30 (1978).

**18.** The method to which the comment refers is described, in relevant part, as follows:

> § 2.510 [Rebate Upon Prepayment]
> \* \* \* \* \* \*
> (4)(a) the unearned portion of the finance charge is no less than the portion thereof attributable according to the sum of balances method to the period from the first day of the computational period *following that in which prepayment occurs* to the scheduled due date... (Emphasis added.) \* \* \*

clude that defendant's identification of its method of calculating prepayment rebates is not in violation of TILA.

## III

■ The quoted paragraph is also the bone of contention in another claim, namely, that the bank violated Reg. Z 226.6(a)[19] by failing to set out the term "finance charge" more conspicuously than its surrounding language. Plaintiff's Memorandum at 29–30; Plaintiff's Supplemental Brief at 16; Complaint ¶ 12(b).

Regulation Z 226.6(a) requires the term "finance charge" to be printed "more conspicuously than other terminology", but only where the term is "required to be used." Thus, the simple legal question before us is whether—in the quoted paragraph—the term "finance charge" is "required to be used" within the meaning of Reg. Z 226.6(a). We answer that question in the negative and, accordingly, find that the bank need not have set out the term "finance charge" more conspicuously.

In dealing with this very question the Federal Reserve Board—whose rules and interpretations are generally binding, *Ford Motor Credit v. Milhollin* (1980) 444 U.S. 555, 565–70, 100 S.Ct. 790, 796–99, 63 L.Ed.2d 22—observed that "[t]he use of the term 'finance charge' with respect to credit other than open end is required *only pursuant to the credit sale provision of [Reg. Z] 226.8(c)(8)(i)* and [the equivalent section in the loan and other nonsale credit section]." F.R.B. Official Staff Interpretation No. FC–0052, 42 Fed.Reg. 16130, March 25, 1977, *reprinted in,* 12 C.F.R. at 725–26 (1982) (emphasis added). Regulation Z 226.-8(c)(8)(i)[20] requires the disclosure of the finance charge and *specifically mandates* the use of the term "finance charge." The object of TILA is to foster the full and accurate disclosure of the cost and the terms of credit. The numerical values of the "finance charge" and of the "annual percentage rate" are, respectively, the essential summary of the cost and the terms of a credit. Therefore, Regulation Z seeks to draw the borrower's attention particularly to those two items only where their amounts are set out in the disclosure document. Accordingly, pursuant to § 226.-8(c)(8)(i), a disclosure document shows—as does the bank's in item 8 on the right side—a conspicuously printed caption which reads "FINANCE CHARGE" accompanied by a *number.* Only in that connection is the term finance charge "required to be used."[21] It follows that in the quoted paragraph the bank has used the term "finance charge" because it is convenient, not because it is "required." *See also* revised Reg. Z 226.17(a)(2), *reprinted in* 12 C.F.R. at 955 (1982) (explicitly including the substance of Official Staff Interpretation No. FC–0052, *supra,* in the revised disclosure regulations for closed-end credit); Revised Reg. Z 226.5(a)(2), *reprinted in* 12 C.F.R. at 920 (1982) (conspicuousness requirement for open-end credit). In that paragraph, therefore, the bank need not have set out the

---

**19.** Reg. Z 226.6(a) states in relevant part:
*Disclosures; general rule.* \* \* \* ...
[W]here the terms "finance charge" and "annual percentage rate" *are required to be used,* they shall be printed more conspicuously than other terminology required by this part and all numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10 point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten (emphasis added). \* \* \*

**20.** This regulation provides:
§ 226.8 *Credit other than open end—specific disclosures*

(c) Credit sales. In the case of a credit sale, ... the following items, as applicable, shall be disclosed:
\* \* \* \* \* \*
(8) Except in the case of a sale of dwelling:
(i) The total amount of the finance charge, *using the term "finance charge,"* and where the total charge consists of two or more types of charges, a description of the amount of each type, ... (emphasis added).
\* \* \* \* \* \*

**21.** Note the specific size requirements for the *numbers* which express the finance charge (and the annual percentage rate). *See* Reg. Z 226.-6(a), note 19, *above.* It stands to reason that only the legend associated with such numbers also requires conspicuous printing.

term "finance charge" more conspicuously than its surrounding language.[22] *Accord Jones v. The Goodyear Tire & Rubber Co.* (E.D.La.1978) 442 F.Supp. 1157, 1162 n. 2; *Owens v. Magee Finance Service of Bogalusa, Inc.* (E.D.La.1979) 476 F.Supp. 758, 765–66. We accordingly find this claim to be without merit.

## IV

Plaintiff also charges the bank with failing to include the premiums for credit life insurance as part of the transaction's finance charge. Complaint ¶ 12(f); Plaintiff's Memorandum at 17–27; Plaintiff's Supplemental Brief at 12–13. The argument is simple: 15 U.S.C. § 1638(a)(6)[23]

and Reg. Z 226.8(c)(8)(i)[24] require creditors[25] to disclose the finance charge and it, in turn, is defined to include premiums for credit life insurance. *See* 15 U.S.C. § 1605(b); Reg. Z 226.4(a)(5).[26] As the bank failed to include the $64.76 in premiums for credit life insurance in the finance charge, plaintiff argues that a TILA violation is established. Defendant submits that the relevant statute and regulation allow premiums for credit life insurance to be excluded if three conditions are met: (a) coverage is not a factor in the approval of credit, (b) the borrower separately signs a writing—after having been given written information of the cost of such insurance—stating that he wants credit life insurance, and (c) the signed writing is specifically

---

**22.** Not only does a conspicuous printing of the term "finance charge" in the allegedly offending paragraph render it less understandable, but a profusion of highlighted terms where conspicuousness is not required, carries the risk that a court will find the disclosure statement "confusing" or "misleading." *Cf. Dixey v. Idaho First National Bank* (9th Cir.1982) 677 F.2d 749, 751–52.

**23.** This provision states:
§ 1638. Transactions other than under open end credit plan
(a) In connection with each consumer credit sale not under an open end credit plan, the creditor shall disclose...
\* \* \* \* \* \*
(6) Except in the case of a sale of a dwelling, the amount of the finance charge,....
\* \* \* \* \* \*

**24.** See note 20, above.

**25.** Plaintiff spares no effort, *see, e.g.,* Plaintiff's Memorandum at 12–16, to demonstrate what the defendant admits from the outset. Namely, that the bank is—in the circumstances of this case—a "creditor" for TILA purposes. Defendant concedes this point, *see* Defendant's Reply Memorandum at 4, and the contract clearly states that the bank and the automobile dealer are both "creditors under this contract for Truth in Lending Act purposes." This lays to rest plaintiff's claim that the bank was only "conditionally identified" as a creditor in violation of Reg. Z 226.8(a). *See* Plaintiff's Memorandum at 29. Furthermore, the status of the bank as "creditor" has been firmly established in the recent Supreme Court decision in *Ford Motor Credit Co. v. Cenance, et al.* (1981) 452 U.S. 155, 157, 101 S.Ct. 2239, 2240, 68 L.Ed.2d 744 (finance institution which extends credit to automobile buyer, provides forms to dealer,

and becomes regularly and immediately the assignee of the sales and credit agreements, is a "creditor" for TILA purposes).

**26.** These two provisions state:
§ 1605. Determination of finance charge
\* \* \* \* \* \*
(b) Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charge unless
(1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing...; and
(2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.
§ 226.4 Determination of finance charge
(a) General rule. ...[T]he finance charge...shall...includ[e] any of the following types of charges:
\* \* \* \* \* \*
(5) Charges or premiums for credit life, accident, health, or loss of income insurance, written in connection with [footnote omitted] any credit transaction unless
(i) The insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and
(ii) Any customer desiring such insurance coverage gives specific dated and separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance.
\* \* \* \* \* \*

dated.[27] Plaintiff contends, however, that there exists a material issue of fact as to whether coverage was a factor in the approval of credit and points out, furthermore, that it is clear from the face of the document that the relevant section is not separately dated. *See, e.g.,* Plaintiff's Supplemental Brief at 12–13, n. 4.

The bank rejoins with two main contentions. First, that—whatever the deficiency of the instalment contract—plaintiff was promptly "sent a correction notice specifying, *inter alia,* the date of the missing insurance authorization." Defendant's Reply Memorandum at 3. *See also* Affidavit of Elwood G. Becker, Jr. This, the bank argues, affords it a complete defense under 15 U.S.C. § 1640(b).[28] Second, the bank states that, in any event, it is not liable for any alleged failures of disclosure in connection with the sale of credit life insurance because such insurance was sold by the dealer, not the bank. It follows, the bank contends, that under Reg. Z 226.6(d)[29] it is exempt from liability because such disclosures are neither "within [its] knowledge" nor within "the purview of [its] relationship with the customer." Plaintiff's Reply Memorandum at 4. In light of our holding below, we need not rule on the bank's contentions under Reg. Z 226.6(d).

■ It is clear that there exists a dispute of material fact concerning the correction notice. Plaintiff states that he certainly never received it and that it was probably never sent. Plaintiff's Reply Brief (Supplemental) at 20–24. Accordingly, the bank's defense under 15 U.S.C. § 1640(b) is not ripe for adjudication in a motion for summary judgment. *See* 6 Moore's Federal Practice ¶ 56.23. For altogether different reasons, however, we believe that the prerequisites for the exclusion of the insurance premiums from the finance charge have been satisfied.

■ The first prerequisite—that the authorization be separately signed—is clearly satisfied on the face of the instalment contract. Second, contrary to plaintiff's argument, his submissions do not raise a material issue of fact as to the next prerequisite—whether coverage was or was not a factor in the approval of credit. Plaintiff intimates that he was hornswoggled by the dealer into signing the insurance request. *See* Affidavit of Plaintiff attached to Plaintiff's 3(g) Statement ¶¶ 3–5. Therefore—it is argued—we may not determine on summary judgment whether credit life insurance was truly voluntary because the bank may have known about such dealer practices or, indeed, even conspired with the dealer to foist unwanted insurance on unsuspecting customers. *See* Plaintiff's Supplemental Brief at 12, n. 4. Plausible or implausible as this argument may be, it turns on plaintiff's evidence that he really did not want the insurance. All we have on this score is plaintiff's bland

---

**27.** The requirement that the customer's acknowledgement be "specific[ally] dated" derives from Reg. Z 226.4, not from the parallel statutory provision, 15 U.S.C. § 1605(b) which includes *only* the requirements that the insurance not be a factor in the extension of credit and that the customer give an "affirmative written indication" of his desire for insurance.

**28.** This section states:
§ 1640. Civil liability. * * *
(b) A creditor has no liability under this section...[for disclosure violations]...if within fifteen days after discovering an error,...the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a charge in excess of the amount or percentage rate actually disclosed.
   *    *    *    *    *    *

We have not been asked to determine whether, on these facts, the bank has a viable "bona fide error" defense under 15 U.S.C. § 1640(c). Even if it did, it is unlikely that such defense could be established on summary judgment. *Teel v. Thorp Credit, Inc.* (7th Cir.1979) 609 F.2d 1268.

**29.** Reg. Z 226.6(d) states:
§ 226.6 General disclosure requirements
  *    *    *    *    *    *
(d) Multiple creditors or lessors; joint disclosure. If there is more than one creditor...in a transaction, each creditor...shall be clearly identified and shall be responsible for making only those disclosures...which are within his knowledge and the purview of his relationship with the customer...
  *    *    *    *    *    *

assertion. *See* Affidavit of Plaintiff attached to Plaintiff's 3(g) Statement ¶ 3. Nonetheless, he signed—ostensibly because of some "vague answer [from the dealer] to the effect that this is the way the [bank's] form was set up, or that it was just part of the form", *Id.* ¶ 5—a document which, in crystal-clear terms, states, "I want life insurance...". A literate plaintiff, who presents no real evidence of fraud or duress, may not be allowed in such circumstances to complain that he did not, in fact, want insurance. In an altogether similar situation the Fifth Circuit stated:

> Although plaintiff asserts that she never requested or desired insurance coverage, but merely signed the documents when told to do so, this assertion is insufficient to vary the terms of the [written] contract or to negate the creditor's full compliance with the disclosure requirements of Regulation Z. The defendant correctly contends that, absent a claim of illiteracy, fraud or duress, no extraneous oral evidence can be presented by the plaintiff to prove that the defendant gave her the impression that the insurance was required.... Consumers should not be encouraged to avoid reading or to ignore the information the Act requires to be provided. *Anthony v. Community Loan & Investment Corp.* (5th Cir.1977) 559 F.2d 1363, 1369–70.

Accordingly, we join the *Anthony* Court in applying the state parol evidence rule—which prohibits the introduction of prior or contemporaneous evidence to contradict the express terms of an agreement, *see Barclays Bank of New York v. Goldman* (S.D. N.Y.1981) 517 F.Supp. 403, 411–12 (citing cases)—to bar the introduction of such evidence as plaintiff here seeks to submit in support of his contention that the credit life insurance was inflicted upon him against his will. *Accord Williams v. Blazer Financial Services, Inc.* (5th Cir.1979) 598 F.2d 1371, 1374; *Uslife v. Federal Trade Commission* (5th Cir.1979) 599 F.2d 1387.

█ We are left, then, with the unsatisfied condition that the request for insurance be specifically dated. Reg. Z § 226.-4(a)(5)(ii). We find this lacuna to have been a *de minimus* violation. *See Dixey v. Idaho First National Bank* (9th Cir.1982) 677 F.2d 749, 752–53 (collecting and discussing cases). In light of the widely-accepted requirement of strict compliance with TILA's technical rules, *Reneau v. Mossy Motors, supra,* 622 F.2d at 195, we would have been disinclined to make such a ruling but for the fact that the Federal Reserve Board—whose rules and interpretations are generally to be regarded as dispositive, *see* 15 U.S.C. §§ 1604, 1640(f); *Anderson Bros. Ford v. Valencia, supra,* 452 U.S. at 219, 101 S.Ct. at 2274; *Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at 565–570, 100 S.Ct. at 796–99—has given us, at least by implication, further guidance on the precise issue before us. The revised Regulation Z which describes the disclosures that are necessary to exclude credit life insurance premiums from finance charges, does not include the requirement that the insurance request be "specific[ally] date[d]."[30] The Federal Reserve Board has thus brought its own rules into conformity with the relevant statutory mandate, 15 U.S.C. § 1605(b)[31], which mandate never included a requirement of dating.[32] The change is, furthermore, not at all inconsistent with TILA's established purpose to promote the "informed use of credit" by assuring "a *meaningful* disclosure of *credit terms* so that the

---

**30.** The revised Regulation Z § 226.4, *reprinted in* 12 C.F.R. at 834 (1982) states, in relevant part:

§ 226.4 Finance charge.

\*     \*     \*     \*     \*     \*

(d) Insurance. (1) Premiums for credit life...insurance may be excluded from the finance charge if the following conditions are met:

(i) The insurance coverage is not required by the creditor, and this fact is disclosed.

\*     \*     \*     \*     \*     \*

(iii) The consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified in this paragraph.

\*     \*     \*     \*     \*     \*

**31.** Set out at the margin above, note 26.

**32.** *See* note 27, above.

consumer will be able to compare more readily the various credit terms available to him..." 15 U.S.C. § 1601(a) (emphasis added) (declaration of purpose). *See also Anderson Bros. Ford v. Valencia, supra,* 452 U.S. at 219–20, 101 S.Ct. at 2274 (citing cases). Dating adds not an iota of "meaningful" information about "credit terms" to that which is already brought to the consumer's attention by the requirement that he separately sign the insurance request. The Federal Reserve Board's elimination of this superfluous technical requirement is also entirely consistent with the purpose of the recent amendments to TILA, *see* TILA Simplification and Reform Act of 1980, Pub.L. No. 96–221, 94 Stat. 132 (1980), enacted to simplify the information provided to consumers and to limit creditor civil liability to significant violations, *see* S.Rep. No. 368, 96th Cong., 2d Sess. 17, *reprinted in* [1980] U.S.Code Cong. & Ad.News 236, 252. *Cf. also Kessler v. Associates Financial Services Co.* (9th Cir.1977) 573 F.2d 577, 578 (TILA and Reg. Z are often no more than "traps for even wary lenders").

In light of the foregoing we find the lack of dating on the insurance request to be a *de minimus* violation, *Cf. Anderson Bros. Ford v. Valencia, supra,* 452 U.S. at 213, 101 S.Ct. at 2270 (retroactive guidance from Federal Reserve Board Interpretation and TILA amendments), and, therefore, that the premiums for credit life insurance were properly excluded from the transaction's finance charge. *But see, e.g., Wright v. Tower Loan of Mississippi, Inc., supra,* 679 F.2d at 446 (citing cases).

## V

Plaintiff also charges the bank with having improperly excluded from the computation of finance charges a $10 premium on the Vendor's Single Interest (VSI) Insurance.[33] Complaint ¶ 12(g); Plaintiff's Memorandum at 27–28; Plaintiff's Supplemental Brief at 14–15.

The argument is similar to that made in connection with the claim that premiums for credit life insurance had improperly been excluded from the computation of the finance charge. It here argues that TILA and Regulation Z require the "finance charge" to be disclosed, 15 U.S.C. § 1638(a)(6); Reg. Z 226.8(c)(8)(i)[34], and it, in turn, is defined as including premiums for VSI insurance, 15 U.S.C. § 1605(c)[35]; Reg. Z 226.4(a)(6)[36].

The dispute turns, again, on whether the defendant has met the disclosure requirements which allow it to exclude the VSI insurance premiums from the computation of the finance charge. The requirements for such exclusion are summarized in Reg. Z 226.404(b) which states:

> If the insurer waives all right of subrogation against the customer in a single interest policy of insurance ... and the

---

**33.** This is insurance which protects—against loss or damage—the creditor's interest in the sold property.

**34.** See notes 23 and 20, above.

**35.** The statute provides:
§ 1605. Determination of finance charge

\* \* \* \* \* \*

(a) ... [T]he ... finance charge ... includ[es]

\* \* \* \* \* \*

(c) Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person to whom the credit is extended, setting forth the cost of the in-

surance if obtained from or through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

**36.** Reg. Z 226.4(a)(6) states:
(a) [The finance charge includes]
(6) Charges or premiums for insurance, written in connection with [footnote omitted] any credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, unless a clear, conspicuous, and specific statement in writing is furnished by the creditor to the customer setting forth the cost of the insurance if obtained from or through the creditor and stating that the customer may choose the person through which the insurance is to be obtained [footnote omitted].

creditor complies with the requirements of [Reg. Z] 226.4(a)(6), charges or premiums for such insurance may be excluded from the amount of the finance charge...

Accordingly, the combined requirements of Reg. Z 226.4(a)(6) and Reg. Z 226.404(b) that must be satisfied for the VSI insurance premiums to be excluded from the computation of the finance charge are: (a) that the insurer waive its right of subrogation against the customer; (b) that the customer receive a written statement of the cost of VSI insurance obtained through the creditor; (c) that the written statement indicate that the customer may choose through whom to obtain such insurance. *See also* F.R.B. Official Staff Interpretation No. FC–0008, 41 Fed.Reg. 47410, October 29, 1976, *reprinted in* 12 C.F.R. at 695–96 (no need to itemize cost of VSI insurance components).

It is undisputed that the insurance carrier has "waived its right of subrogation against the customer with respect to any payment made under the [VSI insurance] policy." Exhibit A to Defendant's Notice of Motion. From the face of the instalment contract it is clear, furthermore, that the cost—$10.00 —of VSI insurance is stated and that the insurance notation is captioned: " ... I MAY CHOOSE THE PERSON THROUGH WHOM THE INSURANCE IS TO BE OBTAINED."

Although it would thus appear that all the requirements for exclusion have been satisfied, plaintiff nonetheless claims that the "spirit" of TILA has been violated by the manner in which defendant disclosed the cost of VSI insurance. The contention boils down to this: defendant should not have stated

"Premium $10.00"

but should rather, have said

"Premium (if obtained through<br>creditor) $10.00"

because the version actually used suggests that $10.00 is the "absolute and invariable" cost of VSI insurance, never mind its source. Thus, it is implied that the over-

sized disclaimer about being able to choose where to obtain insurance is somehow eviscerated.

The argument is close to frivolous. Apart from its lack of substantive merit, it implies that a creditor—although he might have strictly complied with each specific technical disclosure requirement— should be held liable for failing to use a defendant's "new and improved" version of the disclosure document. Absent a showing that a disclosure statement is "confusing" or "misleading", lack of perfection is not a predicate for liability. Defendant has complied with the requirements of the statute. Therefore, plaintiff may not establish liability merely by arguing that the clarity of the disclosure could be improved. *Sanders v. Auto Associates, Inc.* (D.S.C.1978) 450 F.Supp. 900, 904.

Accordingly, we hold that the VSI insurance premium was properly excluded from the calculation of the finance charge.

VI

In connection with the VSI insurance, plaintiff also charges that the bank should be held liable for having set out the $10.00 premium on the line labeled "miscellaneous" rather than on the very next one labeled "physical damage insurance"—both subdivisions of the general heading "other charges." This, plaintiff claims, constitutes a breach of the requirement of Reg. Z 226.-6(a) that disclosures generally "be made clearly, conspicuously, [and] in meaningful sequence..." We hold that plaintiff has failed to establish the charged violation.

The plaintiff argues that the bank violated a *general* mandate that disclosures be clear and not misleading. As we stated in connection with claim # I, to determine whether such general mandate has been breached we must look at what is probable and reasonable, *Williams v. Western Pacific Financial Corp., supra,* 643 F.2d at 339, bearing in mind TILA's purpose to facilitate comparative credit shopping and to promote the informed use of credit. *Brown v. Marquette S & L Assn.* (7th Cir.1982) 686

F.2d 608, 612. We cannot find that this concededly mistaken, one-line transposition rises to the level of a violation of Reg. Z 226.6(a). We have examined all the cases on which plaintiff relies and find them unpersuasive.[37] They all involved significant dissimulation concerning the costs and the terms of credit, the accurate disclosure of which is TILA's central object.[38] *Anderson Bros. Ford v. Valencia, supra,* 452 U.S. at 219–20, 101 S.Ct. at 2274. No case cited by plaintiff—nor the totality of all of them—suggests that the transposition here at issue rises to the level of an "unclear" or "misleading" disclosure. We need go no further to illustrate this conclusion than to invite the reader's comparison between the paltriness of this claim and the gravity of claim # I, above.

■ To be sure, where the claim is that a regulation mandating the disclosure of a specific item or the use of particular terms or arrangements has been violated, then—except in *de minimus* cases—a minor deviation from the prescribed norm suffices to establish liability. Where, by contrast, reliance is placed on the general prescription that disclosures be clear and not misleading, the plaintiff must prove that it is "probable and reasonable" that the alleged disclosure defect would render such disclosure unclear or misleading. The $10.00 at issue here is the only such figure specified under "other

charges" on the left side of the contract and—although on the wrong line—the only such figure under "other charges" in the "statement of transaction" section on the right side. In these circumstances, no reasonable jury could find that from a mere one-line transposition confusion or deception would follow.

## VII

■ Another claim is that the bank failed to include premiums for fire, theft, and collision insurance in the computation of the finance charge. Plaintiff's Reply Memorandum at 6–7; Plaintiff's Memorandum at 28.

The statutory support of this claim is similar to that which underlies the claim made in connection with the exclusion of premiums for credit life insurance, *see* claim # IV, above, and VSI insurance, *see* claim # V, above. Namely, that the applicable statute, 15 U.S.C. § 1638(a)(6)[39], and regulation, Reg. Z 226.8(c)(8)(i)[40], require the disclosure of the "finance charge" which, in turn, is defined to include the (allegedly omitted) premiums "for insurance *written in connection* with any credit transaction..." Reg. Z 226.4(a)(6) (emphasis added)[41]. *See also* 15 U.S.C. § 1605(c)[42].

---

**37.** The cases cited by plaintiff in this connection are *Ives v. W.T. Grant Co.* (2d Cir.1975) 522 F.2d 749; *Gresham v. Termplan, Inc.* (5th Cir.1981) 648 F.2d 312; *Thomka v. A.Z. Chevrolet, Inc.* (3d Cir.1980) 619 F.2d 246; *Smith v. Chapman* (5th Cir.1980) 614 F.2d 968; *Weaver v. General Finance Corp.* (5th Cir.1976) 528 F.2d 589. *See* Plaintiff's Supplemental Brief at 17. The violation at issue in *Ives* involved the contrived arrangement of a disclosure form which had the effect of obscuring and confusing the presentation of the finance charge, making it "appear to be less than it actually is..." *Ives, supra,* 522 F.2d at 759. *Gresham* involved a confusing form which improperly itemized prepaid finance charges. *Thomka* dealt with the cumbersome provisions of two leases which, in "numerous instances", forced the reader to refer to different paragraphs and different pages to find required disclosures. *Smith* involved the "meaningless" description of delinquency charges as "highest lawful contract rate" without ever indicating a specific

percentage amount and specifically stating that a cash price included a tax when, in fact, it was not so included. *Weaver* involved—not entirely unlike claim number 1, above, where we found for plaintiff—a patently misleading statement, in violation of specific regulations to the effect that "[n]o charge [would be] made for credit insurance" when, in fact, premiums were part of the total amount financed.

**38.** Here, by contrast, the $10.00 of VSI insurance premiums are properly excludable from the transaction's finance charge. *See* claim # V, above.

**39.** See note 23, above.

**40.** See note 20, above.

**41.** See note 36, above.

**42.** See note 35, above.

The claim is wholly frivolous. As we understand it, plaintiff's argument is that—had he purchased the collision, theft, and fire insurance specified in ¶ 11 on the reverse of the contract—some unspecified premium should have been included in the finance charge because ¶ 11 does not make the disclosures necessary to exclude such premium from the finance charge. Plaintiff does not ever claim, however, that he bought any collision, theft, or fire insurance. Thus, no such insurance was "written in connection with" this credit transaction.[43] Accordingly, there are no applicable premiums to be included (or excluded) from the finance charge.[44] Cf. Griggs v. Provident Consumer Discount Co. (3d Cir.1982) 680 F.2d 927, 931 n. 4.

## VIII

■ In connection with the same "non-purchased" fire, theft, and collision insurance, plaintiff also claims that the bank violated Reg. Z 226.8(a)(1) by failing properly to disclose on the front page of the contract its "security interest" in such insurance proceeds. Plaintiff's Memorandum at 32–33; Plaintiff's Supplemental Brief at 18–19.

We need not retrace plaintiff's tortuous argument. Suffice it to say that it turns on whether the right to receive the proceeds of such insurance constitutes a "security interest." See Reg. Z 226.8(b)(5); Reg. Z 226.-2(gg). The Supreme Court has recently

answered that question in the negative. Anderson Bros. Ford v. Valencia, supra, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783. Even the plaintiff grudgingly concedes therefore that Valencia disposes of his argument on this claim. Plaintiff's Supplemental Brief at 4.[45]

## IX

It is also claimed that the bank violated TILA by failing to "list the amounts taken as 'dealer fees' for obtaining registration and certificate of title." Plaintiff's Supplemental Brief at 20–21; Plaintiff's Memorandum at 13–14; Complaint ¶ 12(a).

From the dealer's invoice, see Exhibit C to Plaintiff's 3(g) Statement, we note that at issue are a $3.00 inspection fee and $10.00 charged as dealer fee "for obtaining Registration and/or Certificate of Title," both of which fees were included—but not itemized—in the $4950.00 cash price of the automobile set out in the instalment contract. These fees, plaintiff claims, should not have been "lumped in" with the cash price, but separately disclosed by the bank. We agree that they should, indeed, have been itemized but we disagree with the plaintiff as to who is responsible for the disclosure defect.

It is apparent that the disclosure document contravenes TILA in several respects. First, the unitemized inclusion of the $10.00 title fee in the "cash price" violates the

**43.** Although no party has offered an explanation on this question, the VSI insurance appears to be the practical substitute for the insurance described in ¶ 11 on the reverse of the installment contract. We have already found, see claim # V, above, that the VSI insurance premiums were properly excluded from the finance charge.

**44.** It is clear, of course, that "[a]ny proven violation of the disclosure requirements of [TILA] is presumed to injure a borrower," Dzadovsky v. Lyons Ford Sales, Inc. (3d Cir.1979) 593 F.2d 538, 539 (citing cases), and that, accordingly, it is not necessary that the consumer actually be deceived for there to be a violation, Smith v. Chapman (5th Cir.1980) 614 F.2d 968, 971, or that the consumer suffer actual damages for there to be a recovery. Hinkle v. Rock Springs National Bank (10th Cir.1976) 538 F.2d 295, 297. These liberal requirements notwith-

standing, we are aware of no case that has imposed liability on proof that a violation could flow from the use of a particular form in a transaction that has not taken place. Cf. Dixey v. Idaho First National Bank, supra, 677 F.2d 749, 753 (Kennedy, C.J.) (concurring) (suggestion that very liberal application of TILA's statutory damage provisions may violate "case or controversy" requirement).

**45.** Plaintiff's entire argument is subject, of course, to the self-same objection we found dispositive in connection with claim # VII above. Namely, that no insurance was purchased and, accordingly, the bank can hardly be said to have "held" or "acquired" a right to receive proceeds within the meaning of Reg. Z 226.8(b)(5), never mind whether such right could properly be termed a "security interest."

command of Reg. Z 226.2(n)[46] that "cash price ... shall not include any other charges of the types described in [Reg. Z] 226.4"—*i.e.,* title fees.[47] *See* Reg. Z 226.-4(b)(4).[48] Second, the disclosure document is faulty because the fees were excluded from the "finance charge", which exclusion is licit only if the fees are "itemized." *See* Reg. Z 226.4(b)(4); *Zamarippa v. Cy's Car Sales, Inc.* (11th Cir.1982) 674 F.2d 877, 878–79. *Cf. Downey v. Whaley-Lamb Ford Sales, Inc.* (5th Cir.1979) 607 F.2d 1093. The failure to itemize is, alternatively, a violation of Reg. Z 226.8(c)(4) which requires that "[a]ll other charges, *individually itemized,* which are included in the amount financed but which are not part of the finance charge" be disclosed. Reg. Z 226.-8(c)(4) (emphasis added). *See also Downey v. Whaley-Lamb Ford Sales, Inc., supra,* 607 F.2d 1093.

**46.** Reg. Z 226.2(n) states:
(n) "Cash price" means the price at which the creditor offers, in the ordinary course of business, to sell for cash the property or services which are the subject of a consumer credit transaction. It may include the cash price of accessories or services related to the sale such as delivery, installation, alterations, modifications, and improvements, and may include taxes to the extent imposed on the cash sale, but *shall not include any other charges of the types described in [Reg. Z] § 226.4.* (Emphasis added.)

**47.** To be sure, the $3.00 inspection fee could, arguably, be characterized as a "price of services related to the sale" under Reg. Z 226.2(n) and, thus, properly includable in the "cash price." The $10.00 title fee cannot, however, be so included.

**48.** The relevant provision states:
§ 226.4 Determination of finance charge
\*   \*   \*   \*   \*   \*
(b) *Itemized charges excludable.* If itemized and disclosed to the customer, any charges of the following types need not be included in the finance charge:
\*   \*   \*   \*   \*   \*
(4) License, certificate of title, and registration fees imposed by law.
\*   \*   \*   \*   \*   \*

**49.** 15 U.S.C. § 1614 provided:
Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter which may be brought against the original creditor in any credit transaction may be maintained against any subsequent assignee of the original creditor

However, the question before us is this: Who is responsible—the bank or the dealer? In light of the Supreme Court's recent decision in *Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744, holding that a lender in the bank's position is a "creditor" for TILA purposes, the bank has wisely chosen in later briefs not to press its initial argument that, as a "subsequent assignee," it was protected from liability under 15 U.S.C. § 1614[49] because the alleged violations were not "apparent on the face of the instrument assigned..."[50] *See* Defendant's Memorandum at 7–8.

In this situation the bank and the dealer are both original creditors. *See Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744; Reg. Z 226.2(s) (definition of "creditor"); Reg. Z

where the violation from which the alleged liability arose *is apparent on the face of the instrument assigned* unless the assignment is involuntary. (Emphasis added.)

**50.** Equally unmeritorious is plaintiff's cumbersome attempt to parley 15 U.S.C. § 1614, from a limitation of liability of subsequent assignees, into an "affirmative" source of liability of the bank. Plaintiff argues that, if a subsequent assignee is responsible for facially apparent violations, then, perforce, an original creditor must be "more" liable and, thus, responsible for *any* disclosure violation. *See* Plaintiff's Supplemental Brief at 6–11; Plaintiff's Reply Brief at 12–13. In the trite, though apt, formulation of defendant, plaintiff seeks to use § 1614 "as a 'sword' rather than a 'shield'." Defendant's Reply Memorandum at 4–5 n. (\* \* \*). There being, however, no subsequent assignees in this transaction, § 1614 is inapplicable, *Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. at 158 n. 4, 101 S.Ct. at 2241 n. 4, and thus we need not consider the effect of § 1614 (or of its successor) on the division of liability between an original creditor and a subsequent assignee. Plaintiff's argument, however, points in the proper direction. An original creditor should, after all, be "more" liable than a subsequent assignee. The question is *"How much more liable?"* As between original creditors—the situation at bar—the answer to that question is offered by Reg. Z 226.6(d): original creditors are responsible for facially apparent *and* "nonapparent" violations, so long as such violations are "within [their] knowledge and the purview of [their] relationship with the customer..." *See* discussion below.

226.2(h) (definition of "arrange for extension of credit"). Accordingly, their respective disclosure responsibilities are delineated [51] by Reg. Z 226.6(d) which provides:

> (d) Multiple creditors or lessors; joint disclosure. If there is more than one creditor ..., each creditor ... shall be clearly identified and shall be responsible for making *only those disclosures ... which are within his knowledge and the purview of this relationship with the customer...* If two or more creditors ... make a joint disclosure, each creditor ... shall be clearly identified. The disclosures required under paragraphs (b) and (c) of [Reg. Z] § 226.8 shall be made by the seller if he extends or arranges for the extension of credit. Otherwise disclosures shall be made as required under paragraphs (b) and (d) of [Reg. Z] § 226.8 or paragraph (b) of [Reg. Z] § 226.15. (Emphasis added.)

We join the lament of several other courts observing that "what seems clearest ... is that the language [of Reg. Z 226.-6(d)] is very unclear." *Smith v. Lewis Ford, Inc.* (W.D.Tenn.1978) 456 F.Supp. 1138, 1141. No case law has been called to our attention—and we have found none—casting doubt on the soundness of the analysis offered by Judge Lynne in *Childs v. Ford Motor Credit Co.* (N.D.Ala.1969) 470 F.Supp. 708. Among the cases which have considered the quoted regulation in an effort to divide responsibility to make disclosures among joint creditors, the Court identified two categories of decisions. First, a

minority which has imposed liability on the *seller*—in our case the dealer—on the strength of the second sentence of Reg. Z 226.6(d) ("... disclosures ... shall be made by the seller...") [52] *Manning v. Princeton Consumer Discount Co.* (3d Cir.1976) 533 F.2d 102, *cert. denied* 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144. The vast majority of cases, however, have looked with disfavor on the *Manning* rule which automatically insulates lenders—even those sufficiently connected with the transaction to be called "original" creditors—whenever there is a "seller" poised between the source of funds and the buyer. *See Williams v. Bill Watson Ford, Inc.* (E.D.La.1976) 423 F.Supp. 345, 355–56; *Price v. Franklin Inv. Co.* (D.C.Cir. 1978) 574 F.2d 594, 601–02. Accordingly, these cases have carved out the respective areas of liability based on the first sentence of Reg. Z 226.6(d)—"knowledge" and "purview of relationship" test—while either ignoring the second sentence, *Price v. Franklin Inv. Co., supra,* or interpreting it merely as a ministerial directive. *Williams v. Bill Watson Ford, Inc., supra,* 423 F.Supp. at 356. *See also Hinkle v. Rock Springs National Bank* (10th Cir.1976) 538 F.2d 295; *Cenance v. Bohn Ford, Inc.* (5th Cir.1980) 621 F.2d 130, *rev'd on other grounds sub nom. Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744; *Smith v. Lewis Ford, Inc., supra,* 456 F.Supp. 1138; *Childs v. Ford Motor Credit Co., supra,* 470 F.Supp. 708; F.R.B. Official Staff Interpretation No. FC–0164, 44 Fed.Reg. 69630, December 4,

---

**51.** We are aware, of course, that some of TILA's general provisions—not specifically dealing with the apportionment of liability among joint creditors—use altogether sweeping language which does not make such distinctions as are elaborated by the regulations. *See, e.g.,* 15 U.S.C. § 1638 (closed-end credit disclosures) ("... *the* creditor shall disclose ...") (emphasis added); 15 U.S.C. § 1640 (civil liability) ("... *any* creditor who fails to comply ...") (emphasis added). The general disclosure requirement for credit transactions, 15 U.S.C. § 1631, indeed states that "*[e]ach* creditor shall disclose...", but qualifies this mandate with "*in accordance with the regulations* of the [Federal Reserve] board..." (Emphasis

added.) "*Absent a contrary regulation* by the Federal Reserve Board, [TILA] itself seems to provide for joint responsibility for disclosures." *Smith v. Lewis Ford, Inc.,* (W.D.Tenn.1978) 456 F.Supp. 1138, 1141 (emphasis added).

**52.** The obligation to disclose under Reg. Z 226.-6(d) is imposed only on sellers who "extend or arrange for the extension of credit." This condition, however, is supernumerary because Reg. Z 226.6(d) applies only to multiple *creditors* and a seller *must* "extend or arrange for the extension of credit" in order to be labeled a "creditor." *See* Reg. Z 226.2(s) (definition of creditor).

1979, *reprinted in* 12 C.F.R. at 823–24 (1982)[53]

■ We need not speculate—as have other courts—on the wisdom of the *Manning* rule and on the meaning or interpretation of the second sentence of Reg. Z 226.-6(d) because we find that there is no liability under the alternative reading of the regulation.[54] The "knowledge" and "purview of relationship" test is one of fact. *Cenance v. Bohn Ford, Inc., supra,* 621 F.2d 135. On the evidence before us no reasonable jury could find that a disclosure of a car inspection fee or a car registration fee is "within the purview" of the bank's relationship with the plaintiff, never mind whether the bank actually "knew" that the dealer charged such fees.[55] *Cf. Childs v. Ford Motor Credit Co., supra,* 470 F.Supp. at 714. The evidence before us establishes that the bank provided the dealer with forms, regularly provided credit to car buyers, and immediately took assignment of the instal-

ment contract. These are the factors which led the Supreme Court to hold that the bank should be considered a "creditor." *Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744. That—as the *Childs* court observed—is not enough to consider the bank a "seller." The bank is in the business of providing funds for the purchase of cars; there is no evidence, however, that the bank has gone into the "car-dealership" business. There is no suggestion, for instance, that the plaintiff ever would have seriously contemplated that the bank perform the inspection for which the $3.00 fee was charged. Accordingly, we find that the bank is shielded from liability for the failure to itemize the fees at issue because such fees were not "within the purview" of the bank's relationship with the plaintiff.

## X

■ Plaintiff also claims that the bank violated TILA because the instalment con-

53. We need not concern ourselves with a third general category identified by the *Childs* court. Namely, "the numerous cases which have imposed liability on multiple creditors *without* a consideration of [Reg. Z 226.6(d) ]." *Childs v. Ford Motor Credit Co., supra,* 407 F.Supp. at 713 (emphasis added). Understandably, plaintiff seeks to make much of this line of decisions. *See, e.g., Meyers v. Clearview Dodge Sales* (5th Cir.1976) 539 F.2d 511 (authored by Judge Lynne who disavowed its precedential value in *Childs, supra,* 470 F.Supp. at 714); *Joseph v. Norman's Health Club, Inc.* (8th Cir. 1976) 532 F.2d 86; *Mirabal v. General Motors Acceptance Corp.* (7th Cir.1976) 537 F.2d 871. Having reached their conclusion merely as a "byproduct" of a finding that seller and lender were both "creditors"—without considering the impact of the specific regulation which apportions liability among joint creditors—their precedential value is extremely limited. As the court in *Price v. Franklin Inv. Co., supra,* 574 F.2d 594, observed at 601 in criticizing the *Joseph* decision precisely on this score:

We do not, however, go quite so far as the [*Joseph* court]. The conclusion that [a defendant] was a "creditor" does *not in our view require* that it be held liable for all deficiencies in disclosure. Most of the courts have considered the liability of multiple creditors... have found them liable *without fully addressing the effect of Regulation Z § 226.-6(d).* (Emphasis added.)

As we observe in the text, since *Price* several courts have, indeed, considered the liability of

multiple creditors in connection with Reg. Z. 226.6(d).

54. The bank, of course, would not be liable under the *Manning* view because it is not the seller.

55. Plaintiff clamors for further discovery on this question. Plaintiff's Reply Brief at 18–19; Plaintiff's Supplemental Brief at 9. He argues that the bank submitted inadequate answers to various interrogatories which, if properly answered, would have explicated the relation between the *bank and the dealer.* We have, indeed, wide discretion to order further discovery. *See* 6 Moore's Federal Practice ¶ 56.-15[5]. Our discretion would be more favorably disposed towards plaintiff if (a) he had made an effort to explain how the missing answers bore on the purview of the bank's relation with the plaintiff, rather than with the dealer; (b) he had made a motion for sanctions pursuant to Fed.R.Civ.P. 37 *before* moving for summary judgment rather than arguing in Reply and Supplemental briefs that a continuance should be granted to investigate matters which he must have known to be material; (c) there were any indication in our records that he had made an effort to serve process on the bank's named co-defendant—the dealer. In any event, we would not order further discovery because—in light of our having ruled for plaintiff on at least one of his claims—no greater recovery could be had by establishing additional violations. *See* 15 U.S.C. § 1640(g).

tract contained "insufficient identification of creditor Marine Midland." Plaintiff's Memorandum at 33–35; Plaintiff's Supplemental Brief at 19–20; Complaint 12(c). Specifically he argues that the bank's address should have been set out.

This claim is also wholly without merit. Plaintiff's account suggests, to be sure, that he felt he was given a "runaround" as he attempted to establish precisely who—within the bank's organization—could answer questions about the transaction. In the process he was required—so we are given to understand—to make several phone calls until, finally, he reached the appropriate department. The discomfiture at having to navigate a bank's bureaucratic maze without a roadmap may make for a complaint to the bank about second-rate service, but it certainly doesn't make out a claim under TILA for failing adequately to identify the creditor.

Several regulations contain the requirement of identification. *See, e.g.,* Reg. Z 226.6(d) (where there are joint creditors, each "shall be clearly identified"); Reg. Z 226.8(a) (disclosure statement shall be furnished "on which the creditor is identified"). That requirement has been the subject of much litigation, but not precisely on the issue here presented—*i.e.,* whether the bank's address should have been included in the disclosure statement.[56] Our attention has been drawn to no case which requires that a creditor disclose a specific address in order to be "clearly" identified, let alone merely "identified." Plaintiff relies primarily on *Welmaker v. W.T. Grant Co.* (N.D.Ga.1972) 365 F.Supp. 531, 539–40. The case is altogether distinguishable and offers plaintiff no real support. In *Welmaker* the court found that the legend "Seller's Place of Business: # 70" [meaning store # 70], set just below the seller's printed New York City address—ostensibly W.T. Grant's main offices—was a "confus-

ing" disclosure for a Georgia buyer. The court suggested furthermore that "to avoid confusion" the full address of store # 70 should have been disclosed. *Id.* at 540. Three observations follow immediately. First, the facts of *Welmaker*—even on as short a summary as the one given—are clearly distinguishable from those at issue here. There is, for instance, no out-of-state address on this contract. Second, the court's statement that the full address of the Georgia branch store should have been disclosed was no more than a suggestion in dictum—entirely unnecessary to the court's ruling and certainly a far cry from being a basis for judicial imposition of a specific disclosure requirement that is mandated neither by the statute nor by the regulations. Third, the *Welmaker* court found the disclosure in question to be *misleading* rather than specifically in violation of the identification requirement. Accordingly, its ruling is an illustration of how the lack of a specific, local address may result in a violation of Reg. Z 226.6(c)[57] requiring that *additional information* not be used to "mislead or confuse", rather than in a breach of the identification mandate. As a court of the same district observed in rejecting precisely the claim before us:

> ... [I]t is clear that the violation in *Welmaker* was predicated on application of the "catch-all" provision of [Reg. Z] 226.-6(c), *rather than upon any specific statutory or regulatory provision requiring disclosure of the full address* of the creditor. It is one thing to impose liability for a "technical" violation of the language of an express statutory or regulatory provision, and it is another matter entirely to rule ... that omission of a *non-required disclosure,* without more, has rendered a disclosure statement so confusing and misleading as to constitute a violation of the Act. *Houston v. Atlantic Federal S*

---

**56.** We have had, for instance, abundant litigation on the question whether a particular disclosure statement "clearly" identified the creditor's name, *see Childs v. Ford Motor Credit Co., supra,* 470 F.Supp. at 711–12 (citing cases), and over the question whether notifica-

tion of assignment properly "identifies" a subsequent assignee as a "creditor." *Ford Motor Co. v. Cenance, supra,* 452 U.S. at 159 (citing cases).

**57.** See note 7, above.

*& L Assn.* (N.D.Ga.1976) 414 F.Supp. 851, 859 (emphasis added).

We fully concur with the *Houston* court.[58] Plaintiff does not suggest that the absence of an address renders the disclosure statement "misleading" or "confusing." Furthermore, a "common sense" approach is required to determine whether the identification requirement has been met, *Brooks v. Maryville Loan & Finance Co.* (11th Cir. 1982) 679 F.2d 837, 839, especially in light of the Supreme Court's recent statement that "meaningful disclosure" is the animating concept in the area of creditor identification. *Ford Motor Credit Co. v. Cenance, supra,* 452 U.S. at 159, 101 S.Ct. at 2241. In turn, *"[m]eaningful* disclosure does not mean *more* disclosure", but "[r]ather describes a balance between 'competing considerations of complete disclosure...and the need to avoid...[informational overload]'." *Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at 568, 100 S.Ct. at 798 (emphasis in original). With the foregoing in mind it is fanciful even to suggest that the bank should be required—in the absence of a specific mandate to do so—to state an address on its disclosure statement. The bank is identified as Marine Midland Bank in five different places on the instalment contract. There surely could be no doubt in plaintiff's mind as to the identity of the bank. We take judicial notice that the bank's telephone number is listed in the telephone directory. It may take the plaintiff a few phone calls to establish who handles his business, but this is no more than customers of large, metropolitan banks are regularly required to do. It is frivolous to suggest that "an" address would be of substantial help in this matter. Addresses— and even the location of a specific department at a particular address—are likely to change over the expected life of any but the shortest credit transactions. Thus, an

address on a disclosure statement may—by drawing a customer to the wrong location— be confusing or, at least, wasteful. In any event, these speculations suggest that requiring a specific address—especially where the creditor knows precisely with whom he deals—is the type of requirement that should be set after resolving the "competing considerations of complete disclosure and the need to avoid informational overload." It is not for the court to strike the "appropriate balance", *Id.,* but for the administrative agencies with "broad experience with credit practices." *Id.* at 569.

Our attention has not been drawn to any Federal Reserve Board rule or interpretation which supports plaintiff's contention. Furthermore, such creditor identification as the bank provided is at least as generous as that found satisfactory in many cases. *See, e.g., Sharp v. Ford Motor Credit Co.* (7th Cir.1980) 615 F.2d 423, 426; *Augusta v. Marshall Motor Co.* (6th Cir.1979) 614 F.2d 1085, 1086. Accordingly, we find plaintiff's claim that the bank was not properly identified to be without merit. *Accord Frisch v. Casavely-Machens Food, Inc.* (E.D.Mo.1980) 497 F.Supp. 565, 568.

## STATE LAW CLAIMS

The runt of plaintiff's legal litter is the contention that the bank violated New York's Motor Vehicle Retail Instalment Sales Act, Personal Property Law (PPL) §§ 301 *et seq.,* and § 349 of New York's General Business Law (GBL) which bans deceptive practices in the conduct of business. It would surely be an exaggeration to label plaintiff's submission in this regard an "effort" to persuade the court. Rather, all we have from plaintiff on the question of liability is a collection of one-sentence conclusory statements, without elaboration, illustration or citation. *See* Plaintiff's

---

**58.** Plaintiff relies additionally on *Rogers v. Frank Jackson Lincoln-Mercury* (N.D.Ga.1978) 458 F.Supp. 1387, 1390. We briefly point out that *Rogers* relied on *Welmaker* but incorrectly interpreted it as a decision bearing on the identification requirement. *See Houston v. Atlantic Federal S & L Assn., supra,* 414 F.Supp. at 859 (citation in text, above). Furthermore, its find-

ing that a specific address was required is merely dictum—a "throw in" after having ruled that the identification requirement had been violated by a failure clearly to identify a subsequent assignee as a "creditor." However, to the extent *Rogers* may be read as supporting plaintiff's position, we disagree with its ruling.

Memorandum at 35, 36, 39; Complaint ¶¶ 15–16, 18.

The claims under the GBL [59] are predicated on the alleged practice of selling "unwanted" credit life insurance, "quoting the wrong month's rebate figure," and the "inclusion of the various improper (sic) disclosed items back (sic) into the finance charge." We doubt whether, even if proven, all these acts can be termed "deceptive" under GBL § 349. We need not, however, speculate on this matter. Having found for defendant on each of the federal claims predicated on such acts, see claims # # II–VII, above, no recovery may be had under the GBL. See GBL § 349(d).

The claims under the PPL are more varied but equally unmeritorious. First, it is argued that the "[f]ailure to provide [plaintiff with] the required certificate of group life insurance" is a violation of PPL § 302(6). Plaintiff does not deem it necessary to point out precisely where in the vast expanse of subsection 6 of PPL § 302 there is a requirement that a certificate of group life insurance be provided. It appears that the second sentence of the first paragraph is the only provision which contains a requirement that any insurance policy be delivered. On plain reading, however, such requirement applies only to policies of insurance "on the motor vehicle." [60] Plaintiff concedes having received a certificate of insurance "with regard to the vendor's single interest insurance"—the only insurance "on the motor vehicle" written in connection with this transaction. See Plaintiff's Memorandum at 35 n. (*); Exhibit F to Plaintiff's 3(g) Statement. We have been offered not a whit of argument why the statute should be interpreted also to require the delivery of policies of credit life insurance.

Second, plaintiff claims that the bank violated PPL § 305 [61] by failing to rebate unearned credit life insurance premiums. We are, again, given no explanation on precisely how and why the statute is deemed to have been violated. We read the relevant provision as imposing on the "holder of the [instalment] contract"—the bank—an obligation to "pass along" as a credit those unearned premiums which it will receive or which it has received from the insurance carrier. There is no evidence before us, however, that the bank has received or will receive any refund from the insurance carrier.[62]

Third, plaintiff argues that the bank violated PPL § 305 [63] by failing "to

---

**59.** Section 349 states:
(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

\* \* \* \* \* \*

**60.** The statute provides, in relevant part:
§ 302. Requirements as to retail instalment contracts

\* \* \* \* \* \*

6. \* \* \* The seller or financing agency, if insurance *on the motor vehicle* is included in a retail instalment contract, shall within thirty days after execution of the retail instalment contract send or cause to be sent to the buyer a policy or policies or certificate of insurance... (Emphasis added.)

\* \* \* \* \* \*

**61.** The relevant section reads:
§ 305. Credit upon anticipation of payments

\* \* \* \* \* \*

2. The amount of the further refund credit for group credit life insurance shall be equal to the...refund for unearned group credit life

insurance premium *received or receivable by the holder of the contract...* (Emphasis added.)

**62.** It is uncontradicted that the credit life insurance was bought through the dealer—*i.e.*, that the bank merely advanced the premium—and that the bank advised the plaintiff to seek the appropriate refund from the insurance carrier. *See* Affidavit of F.G. Cologgi ¶ 6. There is no evidence before us that the plaintiff has made any effort to obtain a rebate from the insurance carrier, let alone that the carrier does not stand ready to grant such rebate.

**63.** The relevant section reads:
§ 305. Credit upon anticipation of payments
1. \* \* \* The amount of any such refund credit shall represent at least as great a proportion of the credit service charge...as the sum of the periodic time balances after the month in which prepayment is made, bears to the sum of all the periodic times balances under the schedule of installments in the contract...
\* \* \*

fully and properly rebate other portions of the 'credit service charge' "—broadly defined as the prepaid finance charge on the loan. *See* PPL § 301(8). The bank, in fact, rebated unearned finance charges according to an acceptable "Rule of 78's," *see* claim # II, above. Plaintiff makes no effort to demonstrate how such a rebate differs from the rebate rule of PPL § 305 or how the bank has failed, otherwise, "fully" and "properly" to rebate the credit service charge.

■ Fourth, plaintiff claims that the failure to "provide a written statement of the dates and amounts of payments made under the Marine Midland Instalment Contract" is a violation of PPL § 302(12). This provision states that "[u]pon written request from the buyer, the holder of a retail instalment contract shall . . . [provide] to the buyer a written statement of the dates and amounts of payments and the total amount unpaid under such contract." Plaintiff's own statement establishes that no written request was sent to the bank until December 1979, well after the loan had been prepaid. Furthermore, plaintiff admits having received a statement acknowledging that the loan had indeed been paid off. *See* Plaintiff's Affidavit attached to Plaintiff's 3(g) Statement at 5. However, plaintiff characterizes this response as merely "partial" and states that what he really wanted was "a complete explanation of the various parts that went into the total amount that [he] had paid." *Id.* Although we have serious doubts whether PPL § 302(12) can properly be invoked *after* a loan has been paid off, we need not speculate about this question. On the assumption that it can be so invoked, we find that a statement from the bank indicating that the loan had been paid off satisfies the requirements of PPL § 302(12). There is no requirement in the language of PPL § 302(12) that the bank supply the detailed information which the plaintiff supposes himself to be entitled, nor has the plaintiff made any argument to persuade us that such a requirement should be imposed as a matter of judicial interpretation. Accordingly, we find all state law claims to be legally insufficient.

## CONCLUSION

Based on the foregoing we grant summary judgment for plaintiff on the claim that the paragraph in the installment contract dealing with prepayment was unclear and misleading. *See* claim # I, above. Plaintiff's other arguments are without merit.[64] Accordingly, we grant summary judgment in defendant's favor on all other claims.

The statute entitles plaintiff to recover—irrespective of the number of violations, 15 U.S.C. § 1640(g)—the sum of actual damages, statutory damages of twice the amount of finance charges to a maximum of $1,000, costs, and reasonable attorney's fees. 15 U.S.C. § 1640(a). There is no contention that actual damages were suffered in connection with the claim on which plaintiff has prevailed. Furthermore, twice the finance charge—$1,609.84—exceeds the $1,000 limitation. Therefore, plaintiff will be entitled to recover $1,000 in statutory damages, costs, and reasonable attorney's fees.

The entry of judgment in plaintiff's favor will, however, be held in abeyance pending the determination of the amount of reasonable attorney's fees. Let plaintiff's counsel submit—on two week's notice—a properly supported petition for reasonable attorney's fees. Such petition and any papers in opposition will be taken under advisement.

SO ORDERED.

\* \* \* \* \* \*

64. This includes plaintiff's argument—advanced in the Supplemental Affirmation of February 5, 1982—that Reg. Z 226.6 has been rendered superfluous by the 1975 Federal Trade Commission regulation which abrogated the holder-in-due-course defense in consumer credit transactions. *See* 16 C.F.R. § 433.2 (1982).

EXHIBIT

## RETAIL INSTALMENT CONTRACT

No. _____  Date _____ , 19____

**Name and Address of Seller**

Toyota of Rockland Inc.
215 Rte. 59
Monsey, NY 10952

**Names and Addresses of All Buyers (including Buyer named on Title Certificate)**

Abraham S. Kramer  63 Rte.306 Monsey,NY 10952

Marc M. Sevy  63 Rte.306 Monsey,NY 10952

I, me and my refer to each buyer who signs below. You and your refer to the seller and, when this contract is assigned to Marine Midlan Bank, to the Bank. You are both creditors under this contract for Truth in Lending Act purposes. This is the contract of sale to me of the vehicle (including the equipment) described below. I have taken delivery of the vehicle in go condition and agree to the the terms of this contract.

| New | Used | Year | Make | No. Cyl. | Model | Body Type | Identification or Serial No. | Auto. Trans. | Power Steer. | A Cor |
|-----|------|------|------|----------|-------|-----------|------------------------------|--------------|--------------|-------|
| ☒ | ☐ | 1979 | Toyota | 4 | Corolla | sed. | TE 31 635803 | ☒ | ☐ | ☐ |

Special Engine or Other Equipment (Describe)

| Van Convsn | Vinyl Roof | 4 Wheel Drive | AM/FM |
|------------|------------|---------------|-------|
| ☐ | ☐ | ☐ | ☐ |

### DETAILS OF TRADE-IN

Year — Make — Model _____  Identification No. _____

Automobile _____ $_____
Less: Amount Owed — _____
Net Trade-In (Item 2) _____ $_____

### DETAILS OF OTHER CHARGES

MISCELLANEOUS
Dealer (Documentary) Assistance Fee $_____, Registration
Fee $_____, Certificate of Title $_____,
Other _____ $_____
  Specify
Filing Fees $_____  Total (Item 6.a.) $_____

PHYSICAL DAMAGE INSURANCE

If a premium is shown, coverages will be financed on this contract. BUT I MAY CHOOSE THE PERSON THROUGH WHOM THE INSURANCE IS TO BE OBTAINED.

(i) (Optional) Standard Automobile Physical Damage Coverages:

☐ Comprehensive or ☐ $_____ Deductible Comprehensive or ☐ Fire - Theft - Comb. Add'l; ☐ Towing and Labor Costs; ☐ $_____ Deductible Collision. Term _____ Months

Premium $_____

(ii) (Optional) Mechanical Breakdown Insurance for a term of

_____ Months or _____ miles, whichever occurs first.
Deductible $_____;
Insurer _____
Premium $_____

(iii) (Required) Vendor's Single Interest Insurance: Term — Until due date of last payment.
Premium +$ 10.00
Total (Item 6.b.) $ 10.00

GROUP CREDIT LIFE AND DISABILITY INSURANCE

GROUP CREDIT INSURANCE IS VOLUNTARY AND NOT REQUIRED FOR CREDIT. Any coverage I choose to buy will be for the term of the contract and on the buyer signing below.

(i) ☒ I want credit life insurance at a cost of $ 64.76 and have received Certificate No. A136939 issued by Credit Life Insurance Company. (Item 6.c.)

(ii) ☐ I want credit accident and health (disability) insurance at a cost of $ ----- and have received Certificate No. _____ issued by _____ Insurance Company. (Item 6.d.)

Date _____  (Abraham Signature of Buyer to be Insured

### STATEMENT OF TRANSACTION

ITEM NO.
1. Cash Price (Including Taxes) $ 4950.92
2. Net Trade-In (See Details) $ ----
3. Cash Down Payment + 2150.92
4. Total Down Payment (Sum of Items 2 & 3) 2150.92
5. Unpaid Balance of Cash Price (Item 1 minus Item 4) $ 2800.00
6. Other Charges (See Details)
   a. Miscellaneous $ 10.00
   b. Physical Damage Insurance $ _____
   c. Credit Life Insurance $ 64.76
   d. Credit Disability Insurance $ _____
   Total—Other Charges 74.76
7. Unpaid Balance—Amount Financed (Sum of Items 5 & 6) + 2874.76
8. FINANCE CHARGE + 804.92
9. Total of Payments (Sum of Items 7 & 8) $ 3679.68
10. Deferred Payment Price (Sum of Items 4 and 9) $ 5830.60
11. ANNUAL PERCENTAGE RATE 12.75 %

12. The Total of Payments is payable at any office of MARINE MIDLAND BANK
☒ In 48 payments of $ 76.66 each, on the same day of every month beginning on Sept. 3 , 19 79 .
☐ except for the payments below; or
☐ In payments as follows:

| $_____ on_____ | Balloon Payment(s) of |
|------------------|----------------------|
| $_____ on_____ | $_____ on_____ |
| $_____ on_____ | $_____ on_____ |
| $_____ on_____ | $_____ on_____ |
| $_____ on_____ | $_____ on_____ |

No payments will be due in the month(s) of_____
19___; _____, 19___; or_____, 19___.

If one of the boxes below is checked, you have agreed to give me and will attach to this contract: ☐ a dealer warranty ☐ a service contract covering the vehicle.

**1. BALLOON PAYMENTS.** If any of my payments is called a Balloon Payment, I may not refinance its amount without your consent.

**2. LATE PAYMENT CHARGE.** If I am more than 10 days late in paying a payment, I will pay you a late charge of 5% of its amount, but not more than $5.

**3. DEFAULT**— ENTIRE BALANCE DUE. I'll be in default if: (a) I don't pay each payment on time; (b) I break any of my other promises in this contract; (c) a bankruptcy proceeding is filed by or against me; (d) I die; (e) the vehicle is destroyed or substantially damaged; or (f) anything I have told you in my credit application is false.

If I do default, you may, without telling me, declare the entire unpaid balance due at once. You can then require me to pay that balance immediately (but you must give me the same credits and adjustments as you would if I prepaid in full). Then, if I don't pay you immediately, I will pay you interest at 1% per month figured on the unpaid balances (after you give me the agreed credits and adjustments.

**4. PREPAYMENT OF CONTRACT.** If I pay this contract in full before the final due date, what I owe you will be reduced by the amounts of the Finance Charge and insurance charge which have not yet been earned, figured by the Rule of 78's. (That is a method authorized by law for figuring earned charges and refunds.) You may deduct a fee of $15 from the Finance Charge before figuring the unearned

portion. You don't need to give me any Finance Charge credit or insurance charge credit which amounts to less than $1.

**5. SECURITY.** To secure what I owe you under this contract: (a) I give you a security interest under the Uniform Commercial Code in the vehicle and in any other parts or equipment later installed in it; (b) I will make you the loss payee under the physical damage insurance policy covering the vehicle; and (c) you have the right to use any amount I have in any deposit account with you to pay what I owe.

**6. REPOSSESSION.** If you require me to pay the entire balance because of my default, you may, without notice to me or suing me, take possession of the vehicle. I may get the vehicle back if, before you sell it, I pay you the payments in default plus any other charges due and your expenses in taking possession of the vehicle. If I do that, I can make the rest of the payments according to my regular schedule of payments.

**7. MY RESPONSIBILITY.** If I am one of two or more Buyers signing this contract, I agree we will all be responsible to perform its terms. I also agree you may enforce it against any one or more of us.

**8. ADDITIONAL TERMS ON BACK.** The Additional Terms on the back are part of this contract.

**NOTICE TO THE BUYER: 1.** Do not sign this agreement before you read it or if it contains any blank space. **2.** You are entitled to a completely filled in copy of this agreement. **3.** Under the law, you have the right to pay off in advance the full amount due and under certain conditions to obtain a partial refund of the credit service charge. **4.** According to law you have the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of your own selection. **5.** Liability Insurance Coverage For Bodily Injury and Property Damage Caused To Others Is Not Included.

I have read this contract, including the back, and have received a completed copy of this

### RETAIL INSTALMENT CONTRACT

(Abraham S. Kramer) Signature of Buyer

(Marc M. Sevy) Signature of Co-Buyer

☐ If this box is checked and the Co-Buyer was not an applicant for credit, the Co-Buyer is not personally liable to pay the amount owed, but does agree to the security interest terms.

The Seller Agrees to this Contract, including the BACK, and Assigns it to Marine Midland Bank as per its form No. DA-1: 7-72 of STANDARD DEALER'S ASSIGNMENT*, hereby made a part hereof, with the Warranties and Agreements set forth in that Form.
*For a copy, see the last page of the pad in which these forms are bound.
AGREED TO FOR
THE SELLER, BY:

_____
Signature and Title of Seller's Owner, Officer or Partner

T 183 SF (778) Special Motor Vehicle Retail Instalment Contract © 1978 Marine Midland Bank          ORIGINAL FOR BANK

---

## ADDITIONAL TERMS

**9. PROMISE TO PAY.** I will pay you the amount I owe you (the Total of Payments) in the monthly payments shown on the face. I also promise to pay you immediately on your request any sums you pay to satisfy any liens to which the vehicle becomes subject.

**10. SPECIAL AGREEMENT — PURCHASE FOR BUSINESS USE.** If my purchase of the vehicle is primarily for use in business (including farming), this is not a consumer credit contract. In that case, I will not assert against Marine Midland Bank any claim or defense I may have against the Seller unless it is of a type which could be asserted against the holder in due course of a negotiable instrument. The agreement in this paragraph applies only if Marine Midland Bank buys this contract for value, in good faith, and without notice that I have a claim or defense.

**11. TREATMENT OF THE VEHICLE — INSURANCE.** Until I pay you all I owe you under this contract: (a) I will not, without your prior consent, sell the vehicle or transfer the title to it; (b) I will keep the vehicle in good repair; and (c) I will, at my expense, buy insurance running until the due date of the last payment, insuring your interest in the vehicle against at least fire, theft and collision. I will name you as loss payee under each insurance policy I buy on the vehicle.

**12. CHANGES IN CONTRACT.** I agree that this contract cannot be changed without your written consent.

**13. WARRANTIES.** UNLESS YOU HAVE AGREED TO GIVE ME A DEALER WARRANTY OR SERVICE CONTRACT AND WE HAVE CHECKED THE APPROPRIATE BOX ON THE FACE OF THIS CONTRACT, YOU MAKE NO WARRANTIES TO ME, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. ONLY THE MANUFACTURER SHALL BE RESPONSIBLE FOR NEW PRODUCT WARRANTIES IT GIVES.

**14. ATTORNEYS' FEES.** If I default (see Paragraph 3 on the face) and you refer this contract to an attorney to collect what I owe you, I will pay the attorneys' fees you incur equal to 15% of what I owe, plus court costs.

**15. YOUR RIGHTS AFTER TAKING POSSESSION.** If you take possession of the vehicle after my default, you have the right to sell the vehicle. You may use the amount received on the sale to pay first the expenses of the sale and of preparing for it and second the amount I owe you. If the sale price is not enough to pay in full what I owe you, I will pay you any shortage. You will send me a written notice of any sale and a written notice of any shortage for which you are going to hold me responsible.

**16. PROPERTY LEFT IN THE VEHICLE.** If there is any property of mine in the vehicle when you take possession of it, you will hold that property for me for at least 20 days after you take possession. If I want the property, I will, within that 20-day period, tell you what I claim was in the vehicle when you took possession.

## NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

**SUPPLEMENTARY DEALER'S AGREEMENTS.** We (meaning the Seller) make the further agreements with you (meaning Marine Midland Bank) set forth in each (except as you may otherwise elect) of your following forms of SUPPLEMENTARY DEALER'S AGREEMENTS, hereby made part hereof, which is not checked below as "Excluded":

| Title of Form | Form No. | Included | Excluded |
|---|---|---|---|
| $_____ CONTINGENT RESERVE AGREEMENT° | DA-2: 7-72 | ☐ | ☐ |
| CONTRACT REPURCHASE AGREEMENT° | DA-3: 7-72 | ☐ | ☐ |
| _____ MONTHS' CONTRACT REPURCHASE AGREEMENT° | DA-4: 7-72 | ☐ | ☐ |
| REPOSSESSION REPURCHASE AGREEMENT° | DA-5: 7-72 | ☐ | ☐ |
| _____ MONTHS' LIMITED REPOSSESSION REPURCHASE AGREEMENT° | DA-6: 7-72 | ☐ | ☐ |
| LIMITED REPOSSESSION REPURCHASE AGREEMENT° | DA-7: 7-72 | ☐ | ☐ |
| $_____ OPTIONAL PAYMENT AGREEMENT° | DA-8: 7-72 | ☐ | ☐ |

By_____

_____          _____
Seller's Corporate, Firm or Trade Name or Signature          Signature and Title of Officer, Partner or Agent of Seller
*For a copy, see the last page of the pad in which these forms are bound.

T 183 SF (778)