**Linda ROBINSON, Plaintiff-Appellant,**

**v.**

**CENTRAL LOAN AND FINANCE CORPORATION, Defendant-Appellee.**

No. 77–2868.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1980.

Joseph H. King, Jr., Atlanta, Ga., for plaintiff-appellant.

David G. Crockett, Atlanta, Ga., for defendant-appellee.

Before MORGAN, RONEY and GARZA, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Linda Robinson initiated this truth in lending action against her creditor, Central Loan and Finance Corporation, and Central Loan counterclaimed for the amount of the debt. In her reply to the counterclaim, Robinson alleged that her loan contract with Central Loan had also violated provisions of the Georgia Industrial Loan Act. After a hearing before a special master, the District Court for the Northern District of Georgia entered summary judgment for Central Loan on both the claim and the counterclaim. Robinson appeals from that judgment on a number of procedural and substantive grounds.

### I. Truth in Lending Claims.

In her complaint, Robinson alleged generally that Central Loan had violated the credit disclosure requirements of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 *et seq.*, commonly known as the Truth in Lending Act. In the proceedings that followed, Robinson cited more specifically numerous possible truth in lending violations, of which two remain and are urged on appeal. Consideration of the first possible violation, the ambiguity of the security interest description in the loan contract, was precluded at the district court level by the court's determination that the security interest claim had been raised too late in the proceedings to receive the court's attention. Robinson contends that the district court's decision to ignore new arguments raised after a denial of her motion for summary judgment, but before the entry of summary judgment against her, exceeded the court's authority.

The legality of the district court's action can only be judged in the context of the special truth in lending procedures in force in the Northern District of Georgia. Under Local Rule 250,[1] all truth in lending cases are initially referred to a bankruptcy judge acting as special master. The special master then enters a preliminary order which is similar in function to a Rule 16 pre-trial order. The issues having been defined by or under the direction of the preliminary order, the special master receives the evidence and submits to the court his findings of fact and law with recommendations for

---

1. Local Rule 250, N.D.Ga., provides in part:
251.1 Rule 53, Federal Rules of Civil Procedure. The bankruptcy judges of this Court are hereby designated to act as Special Masters under the direction of the Court in accordance with Rule 53, Federal Rules of Civil Procedure.
251.2 Truth-in-Lending Case Assignment. All cases brought under the provisions of 15 U.S.C. § 1640 (Truth-in-Lending Act) by an individual plaintiff shall automatically be initially refer-

enced to the bankruptcy judges of this district on a rotating basis.
251.3 Report of Findings. The within reference under Rule 53 shall be with full powers to the Special Master to hear and determine all issues relating to Truth-in-Lending violations contained therein and to make a written report of findings of fact and conclusions of law with a recommendation to the Court for final action.

final action. The Northern District adopted this procedure in response to the unusually massive truth in lending caseload in that district. In an opinion upholding the validity of the procedure, Chief Judge Edenfield emphasized the necessity of a special approach to truth in lending cases:

The number of truth in lending cases filed with this court is staggering. During the period March 14, 1973 through July 31, 1974, some 725 truth in lending cases have been referred to the bankruptcy judges. During the same period 385 of these cases were finally disposed of by the referees, with almost no appeals and very few petitions for review. Truth in lending cases currently represent 28% of all cases being filed with this court. Handled by the judges as ordinary litigation, this simply would not have been possible. So handled, each defendant would have been entitled to a four months' delay for discovery alone . .. There are literally hundreds of cases being filed under the Act and each calls for a special expertise in a narrow field of the law. Dispatch in the resolution of the issues is a requisite to both the consumer and creditor elements of the public. *The volume of cases demands some procedural device which will permit the parties to brief and argue their positions in a convenient and timely manner.* Local Rule 250 provides such a device.

*Mullinax v. Willett Lincoln-Mercury, Inc.,* 381 F.Supp. 422, 423–24 (N.D.Ga.1974) (emphasis added).

The focusing of the issues by the special master greatly contributes to the efficiency of this system, since truth in lending cases typically involve little dispute of the underlying facts, and the loan contract itself is the principal and often exclusive evidence of the loan company's liability. Most cases can be decided by summary judgment after reference to a special master without the necessity of a trial. If the special truth in lending procedure is to be effective, however, there must be a measure of finality in the actions taken by the special master.

The Truth in Lending Act creates an almost endless list of possible grounds for the creditor's liability,[2] and it is therefore essential to the orderly disposition of claims that the parties be reasonably committed to a limited set of issues before the case is presented to the court for final action. Otherwise, a plaintiff/debtor may introduce one new theory after another, unnecessarily lengthening the proceedings by reopening the case after each setback.

To the end of early issue formation, the Northern District has followed the practice, approved by this circuit, of requiring the plaintiff/debtor to state his claim precisely before the special master so that the special master's findings and recommendations may encompass all the issues in dispute. In *Lamar v. American Finance System of Fulton County, Inc.,* 577 F.2d 953 (5th Cir. 1978), we upheld the refusal of the district court to consider new issues raised by the plaintiff after the special master had submitted his findings and recommendations.

With this background in mind, we turn to the procedural history of this case. Robinson filed her complaint on September 24, 1975, and the case was referred to a special master according to the procedure outlined above. The special master issued a preliminary order on October 24 directing the plaintiff Robinson to submit within thirty days "a preliminary statement of issues showing itemized, specific contentions, reserving any issues which may depend upon required discovery." In compliance with the order, Robinson filed a statement listing two violations of the Truth in Lending Act: first, that Central Loan had overstated the finance charge by including in that amount premiums collected for credit insurance; and second, that Central Loan had improperly labeled the loan fee as a "prepaid finance charge." Thereafter, Robinson abandoned the second argument, and upon moving for summary judgment she submitted a third argument, that Central Loan had failed to disclose the annual percentage rate and amount financed clearly and accurately. This contention was premised on Robin-

2. *See generally* Developments in Georgia Law, "Truth in Lending," 12 Ga.L.Rev. 818 (1978).

son's belief that the decimal point in the percentage rate had been omitted in the forms originally provided to her by Central Loan. In its response to Robinson's motion for summary judgment, Central Loan specifically denied that the decimal point had been omitted in the original documents, and explained that the decimal point did not appear on the copies provided in discovery because the decimal point had failed to survive photocopying.

The special master submitted his first recommendations on May 10, 1976, finding that the first claim, concerning the inclusion of credit insurance premiums in the finance charge, was without merit, but that the omission of the decimal point in the percentage rate in the loan agreement forms entitled Robinson to summary judgment on her truth in lending claims. Central Loan objected to these findings and again asserted the existence of the decimal point in the original forms. Central Loan also raised the "clerical error" defense under 15 U.S.C. § 1640(c) in the event that the decimal point was actually omitted. On September 17, 1976, the district court denied Robinson's motion for summary judgment, and ordered the special master to hold a hearing to determine the availability of the clerical error defense. The court adopted the special master's recommendations on the inclusion of insurance premiums in the finance charge.

During the trial before the special master on December 8, 1976, Central Loan again maintained that the original forms provided to Robinson had indeed contained a decimal point in the percentage rate. The special master found the decimal point to exist on the original and Robinson agreed to this finding. Thus, each of the original truth in lending issues raised by Robinson were concluded in favor of Central Loan.

Contemporaneously with the proceedings on the truth in lending claims, both parties filed motions for summary judgment on Central Loan's counterclaim. At the time of the December 1976 ruling on the truth in lending claims, the special master reserved

further action on the counterclaim to permit further briefing by the parties. On May 10, 1977, the attention of the special master and counsel having shifted exclusively to the counterclaim issues, the special master issued a recommendation for summary judgment for Central Loan on the counterclaim. Robinson now attempted to revive her motion for summary judgment on the truth in lending claims by filing a supplemental brief, raising as a new claim that the ambiguity of Central Loan's security interest description was violative of the Truth in Lending Act. At this time, six months had passed since the special master had issued his truth in lending recommendations. Twenty months had passed since Robinson had first filed her complaint. The special master recommended that the new truth in lending argument was "procedurally precluded." The special master also found that

To allow a new contention now would be unfair to defendant, who long ago determined to incur the legal expense of defending, presumably based in part on his assessment of the merits of the contentions then raised by plaintiff. Had this new contention been timely raised, defendant might have settled to save its own considerable expense. Or the case may have been adjudicated more cheaply. Defendant would not be unduly injured by an award of a civil penalty of One Hundred Dollars and a minimal attorney's fee of One to Two Hundred Dollars. But it would be unfair to have him pay that after a long and costly defense on all the issues timely raised by plaintiff.[3]

The district court adopted the recommendations of the special master and entered summary judgment for Central Loan on the claim and counterclaim.

 We find that it was within the discretion of the district court to decline to entertain the new argument posed by Robinson long after the special master had apparently concluded his investigation of truth in lending claims. Robinson's prelimi-

3. Recommendation of Special Master, June 30, 1977, p. 2.

nary statement of issues, which was filed to comply with the order of the special master, reserved for future development only those additional issues revealed by discovery, but the security interest description argument later presented by Robinson was available to her when the statement was filed and was not revealed by subsequent events. While it is within the power of the court to amend pleadings or pretrial orders to allow the introduction of new issues in the interest of justice, the court must preserve its authority to enforce its orders where necessary to achieve the goals of fairness and judicial efficiency which pretrial orders serve. *Hodges v. United States,* 597 F.2d 1014 (5th Cir. 1979). Arguments raised only after the special master has tried the claims presented before him and issued his recommendations are untimely, and need not be considered except in the interest of justice. *Layfield v. Bill Heard Chevrolet Co.,* 607 F.2d 1097, (5th Cir. 1979); *Lamar, supra; B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co.,* 122 F.2d 900 (1st Cir. 1941). Robinson offers no persuasive reason why the district court should have permitted her to reopen the truth in lending proceedings in order to test a new hypothesis of her cause of action. To further extend the proceedings would work to the detriment of the blameless party by adding additional, unnecessary cost to this litiga-

tion, while any injury resulting from the court's rejection of the untimely argument stems from the failure of the plaintiff to present her case properly. *See Colvin v. United States,* 549 F.2d 1338, 1340, 1341 (5th Cir. 1977).

The remaining truth in lending question is whether Central Loan violated the Act and Regulation Z, 12 C.F.R. § 226.-4(a)(5), when it included the amount of optional credit insurance premiums in its calculation of the finance charge and annual percentage rate. As stated by Central Loan in its agreement with Robinson, the finance charge was $28.10 and the annual percentage rate was 90.80 percent. Not including the premiums, the finance charge was $15.27 and the annual percentage rate was 45.02 percent. The special master and district court held that premiums for optional credit insurance may be included in the finance charge at the option of the creditor. The Act, 15 U.S.C. § 1605(b),[4] and Regulation Z, 12 C.F.R. § 226.4(a)(5),[5] creates two categories of credit insurance: that which is required as a condition for the extension of credit, and that which is optional. Only premiums for insurance required by the insurer must be included in the finance charge. That optional insurance premiums may or must not be included in the finance charge, however, is not clear from the language of the statute or regula-

**4.** 15 U.S.C. § 1605(b) provides:

 (b) Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charge unless

 (1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and

 (2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.

**5.** Section 226.4(a)(5) provides:

 (a) General Rule. Except as otherwise provided in this section, the amount of the finance charge in connection with any transaction shall be determined as the sum of all charges, payable directly or indirectly by the customer, and

imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit, whether paid or payable by the customer, the seller, or any other person on behalf of the customer to the creditor or to a third party, including any of the following types of charges:

 · · · · ·

 (5) Charges or premiums for credit life, accident, health, or loss of income insurance, written in connection with any credit transaction unless

 (i) The insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and

 (ii) Any customer desiring such insurance coverage gives specific dated and separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance.

tions. Congress envisioned a class of charges that might be included or excluded from the finance charge at the discretion of the creditor. Among a list of specific discretionary items are "Any other type of charge which is not for credit and the exclusion of which from the finance charge is approved by the Board by regulation." 15 U.S.C. § 1605(d)(4).

We interpret Regulation Z, § 226.4(a)(5) and 15 U.S.C. § 1605(b), in light of the purposes of the Act,[6] to permit the creditor to include optional credit insurance premiums in the finance charge even though he is not required to do so. Congress intended that creditors should have an alternative to including premiums in the finance charge provided they did not require insurance and took other steps to disclose the cost of the insurance. Conf.Rep.No. 1397, *reprinted in* [1968] U. S. Code Cong. & Admin. News, pp. 1462, 2021, 2022–23. There is no indication in the statute or regulations that disclosure by one alternative method precludes disclosure by the other. The decision of the creditor to include the premiums in the finance charge probably goes furthest toward achieving the purposes of the Act, since the cost of insurance, purchased by the option of the debtor, is a true cost of credit. *See* Paer, *Truth-In-Lending: Protection for the Consumer or for the Creditor?* 24 Emory L.J. 355, 373–376 (1975).

## II. The Industrial Loan Act Claims.

Robinson has conceded in oral argument that the jurisdiction of the district court to hear Central Loan's counterclaim is confirmed by *Plant v. Blazer Financial Services,* 598 F.2d 1357 (5th Cir. 1979). We proceed, therefore, to Robinson's Industrial Loan Act defenses against the counterclaim.

Robinson first argues that Central Loan's requirement that she purchase property insurance as a condition of the loan was violative of the regulations issued by the Industrial Loan Commissioner. One regulation provides:

A lender may require fire insurance on household goods *only* when the face amount of the contract is $200.00 or more. . . .

I.L.A. Regs. § 120–1–11–.04(3).

Another regulation provides:

A creditor may not contract for or receive a separate charge for insurance against loss of or damage to property unless the original amount of the loan, exclusive of the premium charges for all insurance is $100.00 or more and the value of the property is $100.00 or more.

I.L.A. Regs. § 120–1–14–.17(3).

The combined effect of these regulations is that a creditor may offer property insurance for loans of more than $100.00, but must not require property insurance for loans of less than $200.00. Central Loan required property insurance on the collateral for its $128.10 loan to Robinson, and this requirement clearly violated the regulations. It does not necessarily follow, however, that the loan is void. Loans which violate the Industrial Loan Act are void under Ga.Code Ann. § 25–9903. The effect of a violation of the regulations has not been addressed by the Georgia courts, but this court has held that violations of the regulations subject the lender only to administrative penalties, and that the loan remains enforceable. *Plant v. Blazer Financial Services, Inc. of Georgia,* 598 F.2d 1357 (1979).

Robinson argues secondly that the ambiguity of the security interest description renders the loan void under the Industrial Loan Act. Conceding that the Central Loan's security interest description is inexcusably vague, the consequence is only that the security interest is void. Since Central Loan has no enforceable security interest in Robinson's property, the inadequacy of the security interest description cannot invalidate the loan under the Industrial Loan Act. *See Freeman v. Decatur Loan & Thrift Corp.,* 140 Ga.App. 682, 231 S.E.2d 409 (1976).

The judgment of the district court is AFFIRMED.

6. *See Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).