**Beulah Rose DIXON and Raymond Dixon, Plaintiffs,**

v.

**S & S LOAN SERVICE OF WAY-CROSS, INC., and Hudson Management, Inc., Defendants.**

**No. CV 590–001.**

United States District Court, S.D. Georgia, Waycross Division.

Oct. 18, 1990.

---

Gloria A. Einstein, Waycross, Ga., Sidney L. Moore, Jr., Decatur, Ga., for plaintiffs.

Mary Jane Cardwell, Neal L. Conner, Jr., Waycross, Ga., David G. Crockett, Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

This case concerns the Truth-in-Lending Act, 15 U.S.C. §§ 1601 *et seq.* (1988) ("TILA"), and the Georgia Industrial Loan Act, O.C.G.A. §§ 7–3–1 *et seq.* (1980) ("GILA"). The plaintiffs, Mr. and Mrs. Dixon, complain that the defendants violated TILA when defendant S & S Loan Service of Waycross ("S & S") made three loans to them in the winter of 1988–89. Before the Court is the defendant's motion for summary judgment on all counts. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the defendant's motion.

## BACKGROUND

In December 1988, Mr. and Mrs. Dixon each entered into a separate loan agreement with S & S ("the December loans"). Almost two months later, Mr. Dixon procured a third loan from S & S ("the February loan"). The Dixons allege that S & S violated TILA and the regulations promulgated thereunder in making all three loans. In making the December loans, the defendants allegedly violated TILA and the regulations by failing to include vehicle single interest insurance premiums as an element of the finance charge. S & S allegedly violated TILA in making the February loan because it failed to include nonrecording insurance premiums as an element of the finance charge. The Dixons further allege that S & S violated GILA by requiring the Dixons to purchase "Accidental Death & Dismemberment" insurance and by charging them an "excessive, illegal, and unwarranted [vehicle single interest] premium." Under TILA, offenders may be assessed damages and attorney's fees, and this relief is what the Dixons seek.

S & S answered, denying the plaintiffs' allegations of wrongdoing, asserting several affirmative defenses, and counter-claiming for the unpaid balances on the three loans. The Dixons failed to reply to S & S on those counterclaims, and, accordingly, the Court entered judgment for S & S on them. *Court Order*, No. CV 590–001 (July 18, 1990). S & S then moved for summary judgment.

## SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *E.g., Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990). It is then the nonmovant's burden to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. Tech-South, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987). In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Earley*, 907 F.2d at 1080; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). The evidence need not be in a form that would be admissible at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir.1988). "Where the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989). The Court, however, must avoid weighing conflicting evidence, *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *Brown v. Hughes*, 894 F.2d

1533, 1536 (11th Cir.), *cert. denied,* ——— U.S. ———, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir.1986), or making credibility determinations. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *McKenzie v. Davenport Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987).

## ANALYSIS

### A. *TILA Generally*

■ Congress's purpose in passing TILA was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a) (1988). TILA is a remedial statute, and, hence, is liberally construed in favor of borrowers. *E.g., Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir.1990). The remedial objectives of TILA are achieved by imposing "a system of strict liability in favor of consumers when mandated disclosures have not been made." *Id.* Thus, "[l]iability will flow from even minute deviations from the requirements of the statute" and the regulations promulgated under it. *Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371, 1380 (11th Cir.1984); *Smith* 898 F.2d at 898.

To implement TILA, Congress "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in

credit." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980). The Board exercised its authority by promulgating regulations; namely, Regulation Z, 12 C.F.R. § 226 (1990). *See Milhollin,* 444 U.S. at 555, 100 S.Ct. at 790. Regulation Z has the force of law: "[A]bsent some obvious repugnance to the statute[, Regulation Z] should be accepted by the courts." *Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 219, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 (1981). With this framework in mind, the Court proceeds to address the contentions of the parties.

### B. *TILA and Vehicle Single Interest Insurance*

■ S & S has moved for summary judgment on the Dixons' claim that S & S "failed to include in the finance charge an additional $526 charged to each plaintiff as single interest automobile coverage, when such coverage was not sold in accordance with the requirements of Regulation Z." *Complaint* at 3.[1] Single interest insurance is a type of property insurance. Everyday auto insurance is also a type of property insurance. The difference between everyday auto insurance and vendor's single interest insurance on a vehicle offered as collateral is who is protected, and for how much. Common auto insurance protects the driver's interest in the auto for the value of the car. Single interest insurance connected with a secured loan is different:

---

1. Section 1605(c) of TILA, as codified, states:

 (c) *Property Damage and Liability Insurance Premiums Included in Finance Charge.* Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person whom the credit is extended, setting forth the cost of insurance if obtained from or through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

 15 U.S.C. § 1605(c) (1988). Regulation Z clarifies this statutory provision. It states:

 (2) Premiums for insurance against loss of or damage to property, or against liability aris-

 ing out of the ownership or use of property,[5] may be excluded from the finance charge if the following conditions are met:

 (i) The insurance coverage may be obtained from a person of the consumer's choice,[6] and this fact is disclosed.

 (ii) If the coverage is obtained from or through the creditor, the premium for the initial form of insurance coverage should be disclosed.

 [5] This includes single interest insurance if the insurer waives all right of subrogation against the consumer.

 [6] A creditor may reserve the right to refuse to accept, for reasonable cause, an insurer offered by the consumer.

 Regulation Z, 12 C.F.R. § 226.4(d)(2) (1990) (footnotes in original).

It "protects only the creditor's interest, defined as the unpaid balance [of the loan] at the time of the occurrence of the insured risk." *Hernandez v. United Fire Ins. Co*, 79 F.R.D. 419, 423 n. 1 (N.D.Ill.1978); *see Cordova & Simonpietri Ins. Agency v. Chase Manhattan Bank, N.A.*, 649 F.2d 36, 37 (1st Cir.1981). Regulation Z and the Official Staff Interpretations of the regulation make clear that single interest is covered by this regulation. 12 C.F.R. § 226.4(d)(2)(i) n. 5; Official Staff Interpretation, 12 C.F.R. Part 226, Supp. 1 at 285.

To help assure meaningful disclosure of credit terms, section 1605 of TILA ordinarily requires lenders to include single interest premiums in the disclosed finance charge. 15 U.S.C. § 1605(c). Lenders may exclude these premiums only if: (1) the single interest coverage may be obtained from a person of the consumer's choice; (2) that fact is disclosed to the borrower; (3) the cost of such insurance, if obtained from the creditor, is disclosed; (4) the insurer waives all rights of subrogation against the consumer; and (5) that (1)–(4) be disclosed by a "clear and specific statement." The Official Staff Interpretations clarify that, pursuant to requirement (1), "the creditor must allow the consumer to choose the insurer and disclose that fact." Official Staff Interpretations, 12 C.F.R. Part 226, Supp. I at 285 (1990).

S & S claims that it met the requirements needed to exclude these premiums from the finance charge, and requests summary judgment on this claim. S & S obtained the Dixons' signatures on a loan agreement form that provides:

> INSURANCE: We require credit life insurance, credit accident and health insurance, and property insurance covering the collateral for this loan. You may furnish this required insurance through anyone you choose, or you may provide it through an existing policy. If you pay off your loan early, you will have the option either to cancel or to retain your insurance coverage.

This statement complies with the requirements set forth in section 1605(c) and Regulation Z.

The Dixons claim that, despite the disclosure in the loan agreement, S & S violated these provisions of TILA and the regulations. Mrs. Dixon testified in her deposition that she offered to allow her existing car insurance policy to serve as single interest insurance on the car. S & S either refused to accept the proffered policy or merely thought it irrelevant to its request for single interest insurance. Whether this exchange actually occurred, however, is immaterial to this summary judgment motion. In a decision binding on this Court, the former Fifth Circuit held (in a similar TILA case) that, where a loan contract meets TILA disclosure requirements, a borrower may not introduce contemporaneous evidence to contradict the express terms of the loan agreement. *Anthony v. Community Loan · & Invest. Corp.*, 559 F.2d 1363, 1369–70 (5th Cir. 1977); *see USLIFE Credit Corp. v. FTC*, 599 F.2d 1387, 1389–90 (5th Cir.1979); *Williams v. Blazer Fin. Servs.*, 598 F.2d 1371, 1374 (5th Cir.1979); *Kramer v. Marine Midland Bank*, 559 F.Supp. 273, 284 (S.D.N.Y.1983). *But see Kaminski v. Shawmut Credit Union*, 494 F.Supp. 723, 729 (D.Mass.1980) (where *admissions* on file expressly contradict written agreement, such admissions control). Because the Dixons have not claimed that their signature on the loans were the product of illiteracy, fraud, or duress, the parol evidence rule operates to exclude the Dixons' proffered evidence. *See Anthony*, 559 F.2d at 1369 (exception to parol evidence rule for agreements procured because of illiteracy, fraud, or duress). In essence, the parol evidence rule renders that evidence immaterial, *see USLIFE*, 599 F.2d at 1390, and, as such, it creates no genuine issue of *material* fact to defeat summary judgment on this count.

The Dixons, recognizing *Anthony*'s effect on their claim, also attempt to use Mrs. Dixon's testimony as evidence not to contradict the written agreement, but to show that S & S would not allow "insurance coverage ... [to] be obtained from a person of the consumer's choice," as Regulation Z requires. This ploy is unavailing for two reasons. First, calling an apple an

orange does not make it so. The simple fact is that the Dixons are offering oral evidence to contradict the express terms of the agreement. The agreement stated that they could obtain the single interest insurance themselves, or use an existing policy. Yet they voluntarily purchased single interest insurance from S & S, and did so in writing. *Anthony* therefore applies. Second, although the record is not clear on this point, it appears that S & S rejected the Dixons' proffered auto insurance because it only insured the Dixons' equity in the auto. Single interest insurance, however, as explained earlier, protects a fundamentally different interest: the creditor's. The creditor's interest in collateralized property is for the unpaid balance of the loan at the time the insured-against risk occurs. S & S, therefore, had an eminently reasonable cause to reject the Dixon's offer: it protected the wrong interest. For these reasons, the Court GRANTS summary judgment on this ground.

### C. *TILA and Nonrecording Insurance*

■ The Dixons claim that the nonrecording insurance they purchased from S & S was sold to them in violation of TILA. S & S does not agree, and has moved for summary judgment on this ground. Nonrecording (or "non-filing") insurance is "designed ... to compensate the ... lender for its losses resulting solely from its failure to file for public record the instrument securing debt, usually a bill of sale to secure debt, a conditional sale contract, or a chattel mortgage." *American Aviation & Gen. Ins. Co. v. Georgia Telco Credit Union,* 223 F.2d 206, 206–07 (5th Cir.1955). Section 1605(d) of TILA states, in pertinent part:

(d) *Items Exempted from Computation of Finance Charge in all Credit Transactions.* If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in the computation of the finance charge with respect to that transaction:

(1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security interest related to the credit transaction.

(2) The premium payable for any insurance in lieu of perfecting any security interest otherwise required by the creditor in connection with the transaction, if the premium does not exceed the fees and charges described in paragraph (1) which would otherwise be payable.

Regulation Z does not clarify this already clear provision, although the Official Staff Interpretations offer an example of a charge that does not fit within the terms of Section 1605(d)(2): "If the creditor collects and simply retains a fee as a sort of 'self-insurance' against non-filing it may not be excluded from the finance charge." Regulation Z, Official Staff Interpretation, 12 C.F.R. Part 226, Supp. 1 at 286. In other words, the exclusion is only available if the non-filing insurance is actually purchased. *Id.* S & S argues that it met all the statutory and regulatory requirements in this regard: a) the premium was paid to a third-party insurance carrier pursuant to master policy; b) the premium was less than the recording fee itself; and c) the amount of the premium was disclosed to the Dixons in writing. The Dixons do not contest these assertions. Their quarrel is more basic. They claim that the "nonrecording insurance" purchased by S & S was not insurance against nonrecording—it was merely a pool of the "premiums" collected in this manner from all of S & S's borrowers. Claiming that S & S used this pool of funds as a general "reserve to cover all bad debts which had any security interest connected with them," the Dixons allege that this practice violates Regulation Z. Plaintiff's Brief at 11.

To bolster this allegation, the Dixons have marshalled a substantial amount of evidence. First, the Dixons admit that the policy states that it, in part, insures against direct losses sustained by S & S in "enforcing its rights under [the security interest agreement] solely as the result of the failure of the Insured duly to record or file the

[security interest] with the proper public officer or public office." Exhibit F, Defendant's Memorandum in Support of Summary Judgment, at Item 4. The Dixons admit that this appears proper under TILA. But the Dixons point to a subsequent provision which, they claim, belies that statement:

> The maximum aggregate amount the Insured may claim under this agreement shall not exceed 89% of the Insured's premiums collected and paid to the [insurer]. Any subsequent recovery of such claims will be forwarded to the [insurer] as Subrogation to reduce the aggregate amount of claims paid to the Insured.

Exhibit F, paragraph 1. Under this provision, therefore, S & S could never collect from the insurer more than 89% of the total amount of "nonrecording insurance premiums" it had collected and sent to the insurer. The Dixons assert that this shows that the "nonrecording insurance" was not insurance at all.

Second, the Dixons alert the Court to several places in the deposition of Mr. Jimmy P. Hudson, the president of S & S Loan Service and Hudson Management, where Mr. Hudson indicates that this "insurance" policy is actually used as a "reserve for bad debts of all types." Plaintiffs' Brief at 9. For example, the following colloquy took place:

Q[uestion:] [W]hat is the risk that you are trying to protect yourself against by buying this type of coverage?

A[nswer:] To protect us in the event we were not able to pick up the security placed on the loan.

Q Because of somebody having a prior security agreement?

A Well, that could enter into it; or say the security placed was already placed somewhere else and it wasn't disclosed to us, whatever the circumstances might be.

Q So in your opinion if a person came in with, for example, a house full of furniture he had bought from Joe's Furniture Store and Joe already had a security interest recorded down there at the courthouse and you bought this cover-age with respect to that loan and it turned out that the customer had not told you about Joe's Furniture Store's recorded security agreement and the loan went into default, you could collect on this policy to pay that loan; is that your understanding?

A That's correct, sir.

. . . .

Q . . . Suppose this [loan] were declared in default and you learned from the local operating office that you have this $1500 uncollectible, he hadn't paid it, you have got a security interest in household goods and you have nonrecording insurance and you as Hudson Management, Inc., now have to make a decision as to whether to file a claim with Voyager [the insurer] or not; how would you go about making that decision, what would you take into consideration, what would you do?

A Well, on some of them the cars have been disposed of, some of them the furniture has been disposed of, some of the accounts the folks never had the furniture that was mentioned.

Q Suppose they never had the furniture that was pledged, would you file a claim with Voyager?

A Probably after we took legal action in order to try to collect the balance.

Q What if he had the furniture originally but they disposed of it before you got a chance to go after it, would you file a claim with Voyager?

A Probably, after we pursued the legal action.

Deposition of Jimmy R. Hudson, at 29–30, 44. After the Dixons' attorney expressed puzzlement why Mr. Hudson said he would make these claims under a nonrecording insurance policy when the claims had nothing to do with nonrecording, counsel decided to make sure that his own definition of "nonrecording" was identical to Mr. Hudson's:

Q . . . So you are insuring against the risk you take by not recording your security interest at the courthouse; that's what [the contract with Voyager] ap-

pears to be. That's the risk you are insuring against; is that correct?

A Yes, sir.

Q Now if you have a situation such as we have been talking about where the person never even owned the property and lied about all of it at the time he made the loan, then you wouldn't have been able to recover the property whether or not you recorded it because it never existed; is that correct?

*Id.* at 45–46. At this point S & S's attorney objected, claiming that the question called for a legal conclusion which his client was not competent to give. *Id.* Mr. Hudson never answered this question. It is clear from his previous answer, however, that he knew the purpose of the insurance.

The Dixons point to further evidence indicating that the "nonrecording insurance" purchased by S & S from Voyager was not insurance: Mr. Hudson could recall no instance when Voyager ever evaluated, let alone rejected a claim by S & S pursuant to this agreement. Hudson Deposition at 51–52. The Dixons argue that this evidence creates a genuine issue of material fact whether the premium collected by S & S for "nonrecording insurance" was in fact used to purchase true nonrecording insurance. Further, the Dixons argue that this premium is more likely a "premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss," which should have been included in the finance charge under section 1605(a)(5) of TILA.

Having reviewed the evidence in the light most favorable to the Dixons, the Court holds that there is a genuine issue of material fact whether the "nonrecording insurance" premiums collected by S & S were actually used to purchase nonrecording insurance, as required by Regulation Z. Accordingly, the Court DENIES S & S's motion for summary judgment on this issue.

D. *Compulsory Accidental Death & Dismemberment Insurance the Georgia Industrial Loan Act*

 The Dixons also claim that S & S required them to purchase accidental death and dismemberment ("AD & D") insurance as a condition for obtaining the loans, in violation of the regulations promulgated under the Georgia Industrial Loan Act ("GILA"). Ga.Comp.R. & Regs. § 120–1–1–.01 through § 120–1–14–.26 (1990) ("the Georgia regulations"). According to S & S, however, the Dixons were not required to purchase AD & D, but voluntarily chose to do so. S & S also argues that all aspects of S & S's sale of AD & D to the Dixons were in accordance with GILA and the regulations. Moreover, argues S & S, the Georgia parol evidence rules precludes the Dixons from challenging the voluntariness of their purchase of AD & D because they signed a provision stating, "I acknowledge and declare that I have voluntarily purchased this insurance protection, and that said purchase had not been compulsory. I also acknowledge that this insurance is offered neither as a condition nor as a part of a credit transaction." Finally, S & S argues that the Dixons are estopped from making this claim because they, subsequent to the AD & D purchase, requested that the policies be cancelled and loan balances credited for the return premiums.

 The Court agrees with S & S that Georgia's parol evidence rule bars extrinsic evidence to challenge the voluntariness of the Dixons' purchase of AD & D. "Parol evidence is inadmissible to add to, take from or vary a written contract." O.C.G.A. § 13–2–2 (1982). The parol evidence rule is not a rule of evidence, but, rather, a rule of substantive law. *E.g., Southern Stone Co. v. Singer*, 665 F.2d 698, 701 (5th Cir. Unit B 1982) (applying Georgia law). Despite its name, the parol evidence rule also precludes the use of *written* evidence to add to, take from, or vary the terms of a written agreement. *Bank Bldg. & Equip. Corp. of Am. v. Georgia State Bank*, 132 Ga.App. 762, 765, 209 S.E.2d 82 (1974).

The Dixons point to an internal corporate memorandum of the defendants, which was produced during discovery, to bolster their claim that the purchase of AD & D was not voluntary. The memorandum states, in discussing several types of loans offered

by S & S: "All new and former borrower's [sic] are to have AD & D on this loan." The parol evidence rule, however, prohibits the consideration of this document to contradict the plain statement of voluntariness that the Dixons signed. The Court is bound to deem the Dixon's purchase of AD & D in this case as voluntary.[2] Further, because the Dixons voluntarily purchased AD & D, the Court does not see how they have standing to litigate whether S & S, in light of this memorandum, required AD & D of other borrowers.

 This leaves only the issue whether the terms of S & S's sale of AD & D measures up to the requirements of GILA and the Georgia regulations. O.C.G.A. § 7–3–14(3)(B) states, in pertinent part, that a GILA lender "may accept *as security on any loan* ... the following: ... Reasonable insurance on the life and health of the principal party." (emphasis added) The Dixons reason that, because AD & D is not a typical example of life or health insurance, it is not "reasonable" within the meaning of the statute. This argument misses the point, however. Section 7–3–14(3)(B) applies only to insurance purchased "as security on any loan," i.e., credit insurance. The AD & D agreement signed by the Dixons, however, plainly states that "this insurance is offered neither as a condition nor as part of a credit transaction." Thus, to the extent that the Dixons are contending that the AD & D was credit insurance, the parol evidence rule precludes that contention. To the extent that the Dixons are arguing that S & S's sale of noncredit AD & D to them violated this section, they are misreading the statute.

 Moreover, assuming arguendo the Dixons were correct that the sale of AD & D violated the Georgia regulations in section 120–1–14 et seq., Georgia law affords them no right to sue for such violations. Section 120–1–14–.26 provides that "[a]ny

person who fails to comply with the requirements of this Regulation [§ 120–1–14 *et. seq.*] shall be subject to such penalties as may be appropriate under Chapter 25–3 of the Georgia Code Annotated and the Rules and Regulation promulgated thereunder." Although this regulation refers to the superceded version of the Georgia statutes, the regulation is still extant. Moreover, the Dixons have pointed to no section of the current Code which affords them such a right to sue. A violation of the type complained of here by the Dixons, therefore, subjects the alleged violator only to such administrative sanctions as requested by the Georgia Insurance Commissioner. *Robinson v. Central Loan & Finance Corp.*, 609 F.2d 170, 175 (5th Cir.1980); *Plant v. Blazer Fin. Servs., Inc.*, 598 F.2d 1357, 1368 (5th Cir.1979). The Dixons, therefore, are not the proper parties to make this claim; the Insurance Commissioner is. Accordingly, the Court GRANTS S & S's motion for summary judgment on this point.

E. *Vehicle Single Interest Insurance and GILA*

The plaintiffs further allege that S & S's sale of vehicle single interest insurance to the Dixons violates GILA and the Georgia regulations. Specifically, they allege that, in violation of O.C.G.A. §§ 7–3–14 and 7–3–15: a) there is no evidence that such insurance was actually issued with regard to Mrs. Dixon's loan, even though she was charged $526 for it; b) because the insurance was for $3552, and S & S has not shown that the car insured, a 1981 Mercury Cougar, was actually worth that much, the insurance was not reasonable with the meaning of the Georgia regulations; and c) although not mentioned in the complaint or the Dixons' answers to compulsory interrogatories, *see* Local Rule 8.6, the single interest insurance was unlawful under O.C.G.A. § 33–24–4 (1990) (Chapter 24 of Title

---

**2.** Because the parol evidence rule is a rule of substantive law, the Court is not passing on the admissibility of parol evidence as an evidentiary matter, but as a rule of contract construction. *Cf. Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553;

*Cottle*, 849 F.2d at 575 (district court, on summary judgment, may not consider evidentiary admissibility of evidence of disputed fact offered by nonmovant.)

**1576**

33 deals with the sale of insurance generally).

S & S makes several counterarguments, but the Court need not address them. As mentioned above, an alleged violation of the Georgia regulations, section 120-1-14, subjects alleged offenders only to administrative sanctions; it confers no private right of action for claimed violations. The Dixon's new argument that the insurance also violates other sections of the Georgia Statutes is immaterial to the allegations in the complaint. The Court will not, on summary judgment, address issues not mentioned in the complaint. Accordingly, the Court GRANTS summary judgment to S & S on this contention.

F. *Dual Loans and GILA*

In their brief, the Dixons have agreed to abandon this Count of the complaint. The Court therefore GRANTS S & S's motion on this count.

CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the defendant's motion for summary judgment,[3] as follows:

1) S & S's motion for summary judgment as to Complaint, § V, para. 10(a) is GRANTED;

2) S & S's motion for summary judgment as to Complaint, § V, para 10(b) is DENIED;

3) S & S's motion for summary judgment as to Complaint, § VI, para. 14(a) is GRANTED;

4) S & S's motion for summary judgment as to Complaint, § VI, para. 14(B) is GRANTED;

5) S & S's motion for summary judgment as to Complaint, § VI, para. 14(c) is GRANTED;

SO ORDERED.

---

**3.** Defendant Hudson Management, a corporate relation of S & S, has not moved for summary judgment. Because, however, Hudson Management is essentially an alternative defendant, not one against whom separate and distinct allegations are levelled, this judgment also applies to it, as well.